Opinion
KENNARD, J.
Plaintiff sued his former employer under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.), alleging that defendant employer failed to reasonably accommodate his physical disability and refused to rehire him in retaliation for plaintiff’s having filed a workers’ compensation claim. Thereafter, defendant learned of information suggesting that plaintiff, to gain employment with defendant, had used another man’s Social Security number.
The trial court denied defendant employer’s motion for summary judgment. When defendant sought a writ of mandate in the Court of Appeal, that court issued an alternative writ. In response, the trial court vacated its order denying defendant’s motion for summary judgment, and it entered an order granting the motion. Plaintiff employee appealed from the ensuing judgment, which the Court of Appeal affirmed. It held that plaintiff’s action was barred by the doctrines of after-acquired evidence and unclean hands (based on information defendant acquired during discovery showing wrongdoing by plaintiff), and that here application of those doctrines was not precluded by Senate Bill No. 1818 (2001-2002 Reg. Sess.) (Senate Bill No. 1818), enacted in 2002 (Stats. 2002, ch. 1071, pp. 6913-6915). That state law declares: “All protections, rights, and remedies available under state law, except any reinstatement remedy prohibited by federal law, are available to all individuals regardless of immigration status who have applied for employment, or who are or who have been employed, in this state.” (Stats. 2002, ch. 1071, § 1, p. 6914, italics added.)
After we granted plaintiff employee’s petition for review, we asked both parties for supplemental briefing on whether federal immigration law preempts California’s Senate Bill No. 1818, an issue the parties had not raised before. We conclude: (1) Senate Bill No. 1818, which extends state law employee protections and remedies to all workers “regardless of immigration status,” is not preempted by federal immigration law except to the extent it authorizes an award of lost pay damages for any period after the employer’s discovery of an employee’s ineligibility to work in the United States, and (2) contrary to the Court of Appeal’s holdings, the doctrines of after-acquired evidence and unclean hands are not complete defenses to a worker’s claims under California’s FEHA, although they do affect the availability of remedies. Accordingly, we reverse and remand the matter for further proceedings.
*415 I
Because this case arises from an order granting summary judgment to a defendant, we briefly set forth the governing principles. A trial court should grant a defendant’s motion for summary judgment if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. On appeal, we review the matter independently, resolving in the plaintiff’s favor any doubts regarding the propriety of summary judgment. (Elk Hills Power, LLC v. Board of Equalization (2013) 57 Cal.4th 593, 605-606 [160 Cal.Rptr.3d 387, 304 P.3d 1052].)
Defendant Sierra Chemical Co. manufactures, packages, and distributes chemicals for treating water, including water in swimming pools. As the weather gets warmer in spring and summer, consumer demand for defendant’s products increases, while in fall and winter demand decreases, which in turn results in defendant’s seasonal layoffs of many production line employees. Those laid-off workers generally are recalled to work when consumer demand rises.
In April 2003, plaintiff Vicente Salas applied for a job with defendant, providing a Social Security number and a resident alien card. He completed and signed, under penalty of perjury, federal Immigration and Naturalization form 1-9, in which he listed the same Social Security number he had given to defendant, and he attached to the form a copy of a Social Security card with that number. He also signed an employee’s Internal Revenue Service withholding form W-4, which had the same Social Security number he had given defendant. In May 2003, plaintiff began working on defendant’s production line.
In October 2003, plaintiff was laid off because of defendant’s seasonal reduction of production line workers. In March 2004, when plaintiff was called back to work, he used the same Social Security number as before, and the same number again appeared on federal 1-9 and W-4 forms he completed. In December 2004, plaintiff was again laid off. When he was recalled to work in March 2005, the federal W-4 form he signed had the same Social Security number he had provided earlier. Plaintiff was not laid off during the fall and winter of 2005.
In late 2004 or early 2005, plaintiff received a letter from the federal Social Security Administration stating that his name and Social Security number did not match the agency’s records. Some of his co workers received similar letters. Plaintiff asserts that a few days later defendant’s production manager, Leo Huizar, told the workers not to worry about discrepancies with Social Security numbers because as long as the company’s president was satisfied with their work they would not be terminated.
*416 In March 2006, plaintiff injured his back while stacking crates on defendant’s production line, and he was taken to a hospital. The next day, plaintiff returned to work under a physician’s restrictions that he was not to lift anything weighing more than 10 to 15 pounds; he was not to sit, stand, or walk for prolonged periods; and he was to limit bending, twisting, and stooping at the waist. Defendant employer modified plaintiff’s work duties accordingly. On June 9, after giving defendant a doctor’s release, plaintiff resumed full duties.
On August 16, 2006, plaintiff again injured his back while stacking crates and was taken to the hospital. That same day he returned to work, finishing his shift under the same work restrictions as before. Thereafter, plaintiff filed a workers’ compensation claim for his workplace back injury. Plaintiff still came to work, performing modified duties, until December 15, 2006, when he was laid off during defendant’s seasonal reduction of workers.
In either late January or early February of 2007, plaintiff started working for another company. According to plaintiff’s declaration filed in opposition to defendant employer’s motion for summary judgment, Leo Huizar, defendant’s production manager, telephoned him in March 2007. Huizar asked plaintiff if he wanted to return to work and if he had fully recovered from his back injuries. When plaintiff said he was still seeing a doctor, Huizar responded that plaintiff could “not return to work like that,” adding it would violate defendant employer’s policies to do so.
On May 1, defendant sent plaintiff a letter stating that it was recalling laid-off employees and informing him to call or come to defendant’s office to make arrangements to return to work. The letter also told him to bring “a copy of your doctor’s release stating that you have been released to return to full duty.”
According to Huizar’s declaration in support of defendant’s motion for summary judgment, plaintiff contacted Huizar on May 6, 2007, and said that he had not reported for work as he had not yet been released by his physician but that he had an appointment on June 12 to obtain the release. Huizar then agreed to hold the job open for plaintiff until plaintiff obtained the doctor’s release, and Huizar told plaintiff to call him if plaintiff was unable to get the release. Huizar never heard from plaintiff again.
In August 2007, plaintiff sued defendant. Plaintiff alleged two causes of action. The first cause of action alleged that plaintiff was disabled and that defendant failed to provide reasonable accommodations for his disability, in violation of California’s FEHA. The second cause of action alleged that defendant wrongfully denied plaintiff employment, in violation of the public *417 policy expressed in the FEHA, by retaliating against him for filing a workers’ compensation claim against defendant and for being disabled. Both causes of action sought to recover lost wages, compensatory damages for emotional distress, punitive damages, and attorney fees.
After trial was set for April 9, 2009, both parties filed motions in limine. In one of his motions, plaintiff employee acknowledged that it is a criminal offense under federal law (18 U.S.C. § 1546(b)(2)) and a felony under state law (Pen. Code, § 114) for a person to use false identification documents to conceal the person’s true citizenship or resident alien status. Plaintiff stated that he would testify at trial and assert his privilege against self-incrimination under the Fifth Amendment to the United States Constitution if asked about his immigration status. He asked that he be allowed to assert the privilege outside the jury’s presence and that the court and counsel not comment at trial on his assertion of the privilege. This information led defendant employer to investigate the authenticity of the documents plaintiff had given to defendant in connection with plaintiff’s employment by defendant.
On July 24, 2009, defendant filed a motion for summary judgment, which is at issue here. Defendant sought a determination by the trial court that defendant was entitled to a judgment as a matter of law under the legal doctrines of after-acquired evidence and unclean hands, based on plaintiff’s fraudulent use of another person’s Social Security number and card to obtain employment with defendant. In support, defendant submitted a declaration from Kelly R. Tenney saying that he is a resident of North Carolina and has a certain Social Security number, which is the one plaintiff used when he applied for a job with defendant. Tenney said in his declaration that he did not know plaintiff and had given no one permission to use his Social Security number. Defendant also provided a declaration from its president, Stanley Kinder, stating that defendant has a long-standing policy of not hiring anyone who is prohibited by federal law from working in the United States, and that defendant would immediately discharge any employee upon defendant’s discovery that the employee had given defendant false information or documents to establish work eligibility in the United States.
When the trial court denied defendant employer’s motion for summary judgment, defendant, sought a writ of mandate from the Court of Appeal. When that court issued an alternative writ, the trial court vacated its earlier order denying defendant’s motion and entered a new order granting the motion. Plaintiff appealed from the ensuing judgment, which the Court of Appeal affirmed. The Court of Appeal concluded that plaintiff’s claims were barred by both the doctrine of after-acquired evidence and the doctrine of unclean hands.
*418 The Court of Appeal reasoned that the doctrine of after-acquired evidence barred plaintiff’s causes of action because he had misrepresented to defendant employer his eligibility under federal law to work in the United States. It also held that plaintiff’s claims were subject to the doctrine of unclean hands because he had falsely used another person’s Social Security number in seeking employment with defendant, he was disqualified under federal law from working in the United States, and his conduct exposed defendant to penalties under federal law.
II
The threshold inquiry here is whether the federal Immigration Reform and Control Act of 1986 (8 U.S.C. § 1101 et seq.), also known as IRCA, preempts application of the antidiscrimination provisions of California’s FEHA to workers who are unauthorized aliens.[1] For the reasons given below, we conclude that the FEHA is generally not preempted by federal immigration law, but that federal preemption does bar an award of lost pay damages under the FEHA for any period of time after an employer’s discovery of the employee’s ineligibility under federal law to work in the United States.
Federal immigration law requires employers to verify the identity and work eligibility of new employees (8 U.S.C. § 1324a(a)(l)(B)(i)); upon an employer’s discovery of a worker’s unauthorized immigration status, termination is required (id., § 1324a(a)(2)). An employer who violates these federal law provisions is subject to civil fines (id., § 1324a(e)(4)(A)) and to criminal prosecution (id., § 1324a(f)(l)). A worker who uses false documents to gain employment is likewise subject to civil fines and criminal prosecution. (Id., § 1324c(a)(1) — (3); 18 U.S.C. § 1546(b).)
The California law at issue here is not only the FEHA, but also Senate Bill No. 1818, which added to California’s statutory scheme four nearly identical provisions: Civil Code section 3339, Government Code section 7285, Health and Safety Code section 24000, and Labor Code section 1171.5.[2] Particularly pertinent here is Government Code section 7285, which states:
*419 “The Legislature finds and declares the following:
“(a) All protections, rights, and remedies available under state law, except any reinstatement remedy prohibited by federal law, are available to all individuals regardless of immigration status who have applied for employment, or who are or who have been employed, in this state.
“(b) For purposes of enforcing state labor, employment, civil rights, and employee housing laws, a person’s immigration status is irrelevant to the issue of liability, and in proceedings or discovery undertaken to enforce those state laws no inquiry shall be permitted into a person’s immigration status except where the person seeking to make the inquiry has shown by clear and convincing evidence that the inquiry is necessary in order to comply with federal immigration law.
“(c) The provisions of this section are declaratory of existing law.
“(d) The provisions of this section are severable. If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.” (Italics added.)
The California Legislature enacted Senate Bill No. 1818 in 2002 in response to the United States Supreme Court’s decision earlier the same year in Hoffman Plastic Compounds, Inc. v. NLRB (2002) 535 U.S. 137 [152 L.Ed.2d 271, 122 S.Ct. 1275] (Hoffman). (See Sullivan v. Oracle Corp. (2011) 51 Cal.4th 1191, 1197, fn. 3 [127 Cal.Rptr.3d 185, 254 P.3d 237].) In Hoffman, the National Labor Relations Board (NLRB) had determined that an employer violated the National Labor Relations Act (NLRA; 29 U.S.C. § 151 et seq.) by selecting four employees for layoffs because they had supported a union’s organizing activities. One of those employees, Jose Castro, testified at the administrative hearing that he was illegally in the United States and had used a friend’s birth certificate to obtain a California driver’s license and a federal Social Security card, enabling Castro to obtain employment before and after the layoff. (Hoffman, at p. 141.) The NLRB awarded Castro backpay plus interest from the date he was laid off until the date the employer first learned of Castro’s undocumented status, a period of four and one-half years. (Id. at pp. 141-142.) The federal court of appeals upheld the NLRB’s award. The United States Supreme Court reversed. It said that the NLRB could not “award backpay to an illegal alien for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud.” (Id. at p. 149.) “[A]warding backpay to illegal aliens,” the high court held, “runs counter to policies underlying” the Immigration Reform and Control Act of 1986. (Hoffman, at p. 149.)
*420 Under the United States Constitution’s supremacy clause (U.S. Const., art. VI, cl. 2), federal law can preempt or supersede state law. California law, as established by Senate Bill No. 1818, makes all state-provided worker protections, rights, and remedies (except reinstatement prohibited by federal law) “available to all individuals regardless of immigration status.” (Gov. Code, § 7285, subd. (a).) Are those worker protection state law provisions preempted by the federal Immigration Reform and Control Act of 1986, which the high court held in Hoffman, supra, 535 U.S. 137, prohibited the NLRB from awarding backpay to an unauthorized alien who used false documents to get a job? The answer cannot be found in Hoffman, which did not decide any issue regarding federal preemption of state law but instead addressed federal immigration law’s impact on a federal agency’s authority to award a remedy for a violation of federal law. At issue here, by contrast, is whether federal immigration law preempts a state antidiscrimination law enforced through a private action for damages.
Furthermore, California’s FEHA, at issue here, differs significantly from the NLRA, at issue in Hoffman. In enacting the FEHA, California’s Legislature sought to safeguard the rights of all persons to seek, obtain, and hold employment without discrimination on account of various characteristics, including race, national origin, physical disability, and medical condition. (Gov. Code, § 12920; see Chavez v. City of Los Angeles (2010) 47 Cal.4th 970, 984 [104 Cal.Rptr.3d 710, 224 P.3d 41]; Stevenson v. Superior Court (1997) 16 Cal.4th 880, 891 [66 Cal.Rptr.2d 888, 941 P.2d 1157].) To combat invidious employment discrimination, the FEHA’s remedial scheme depends heavily on private causes of action in which compensatory damages, including lost pay, may be awarded. (See Armendariz v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal.4th 83, 112 [99 Cal.Rptr.2d 745, 6 P.3d 669] [“[U]nder the FEHA, private civil actions by employees are the primary means of enforcing employees’ rights to be free of unlawful discrimination, once the Department of Fair Employment and Housing determines it will not file a complaint against the employer.”]; Commodore Home Systems, Inc. v. Superior Court (1982) 32 Cal.3d 211, 218, fn. 8 [185 Cal.Rptr. 270, 649 P.2d 912] [noting that the Department of Fair Employment and Housing routinely issues right-to-sue letters to FEHA claimants].)
The federal NLRA, to achieve its goals, does not similarly rely on private causes of action or the remedy of lost pay damages. Rather, the NLRB can adequately enforce the NLRA’s policies by issuing remedial orders enforceable through its contempt power. (See Hoffman, supra, 535 U.S. at p. 152 [stating that “such ‘traditional remedies’ ” are “sufficient to effectuate national labor policy regardless of whether the ‘spur and catalyst’ of backpay accompanies them”].) Because of this critical difference between California’s FEHA and the federal NLRA, relating to the role played by lost pay awards in achieving California’s remedial legislative goal, we do not *421 consider the high court’s decision in Hoffman controlling here. (See Rivera v. NIBCO, Inc. (9th Cir. 2004) 364 F.3d 1057, 1066-1067 [expressing doubt that Hoffman applies to federal title VII cases because title VII, like the FEHA, relies on private actions for enforcement]; Majlinger v. Cassino Contracting Corp. (N.Y.App.Div. 2005) 25 A.D.3d 14 [802 N.Y.S.2d 56, 66] [“the holding of Hoffman is not so broad as to require a ruling that a New York court’s award of lost wages to an undocumented alien is preempted by [federal immigration law] or the policy underlying it”].)
In addressing the issue of federal preemption, we note, preliminarily, that the federal Immigration Reform and Control Act of 1986 does not preempt all state laws relating to unauthorized aliens. In the words of the high court: “Power to regulate immigration is unquestionably exclusively a federal power. [Citations.] But the [United States Supreme] Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised.” (De Canas v. Bica (1976) 424 U.S. 351, 354-355 [47 L.Ed.2d 43, 96 S.Ct. 933] (De Canas).) The high court reaffirmed that observation recently in Arizona v. United States (2012) 567 U.S. __ [183 L.Ed.2d 351, 132 S.Ct. 2492, 2503-2504],
The high court in Arizona v. United States reiterated the three established types of federal law preemption. Federal law preempts a state law when: (1) Congress, acting within its authority, enacts an express provision requiring preemption; (2) the federal regulation’s reach is so pervasive as to leave no room for state regulation, or the federal interest is so dominant that it will be assumed that federal law displaces any state law on the same subject; or (3) the state law conflicts with federal law, either because compliance with both laws is impossible or because the state law is an obstacle to accomplishing congressional objectives. (Arizona v. United States, supra, 567 U.S. at p._[132 S.Ct. at pp. 2500-2501]; English v. General Electric Co. (1990) 496 U.S. 72, 78-79 [110 L.Ed.2d 65, 110 S.Ct. 2270]; see Viva! Internal Voice for Animals v. Adidas Promotional Retail Operations, Inc. (2007) 41 Cal.4th 929, 936 [63 Cal.Rptr.3d 50, 162 P.3d 569].) Because “ [federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect” (Arizona v. United States, supra, at p._[132 S.Ct. at p. 2500]), the presumption is against federal preemption of state law. In preemption analysis, therefore, “courts should assume that ‘the historic police powers of the States’ are not superseded ‘unless that was the clear and manifest purpose of Congress.’ ” (Id. at p. ._[132 S.Ct. at p. 2501].)
*422 We now apply these principles to the question here of whether federal immigration law (specifically, the federal Immigration Reform and Control Act of 1986) preempts California’s Senate Bill No. 1818, which was enacted in 2002.
Turning to the first type of preemption- — express preemption — we note that the federal Immigration Reform and Control Act of 1986 has an express preemption provision, which states: “The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ . . . unauthorized aliens.” (8 U.S.C. § 1324a(h)(2), italics added.) We agree with plaintiff employee that this provision is inapplicable here. Rather than asserting any claim of employer wrongdoing in hiring unauthorized aliens, plaintiff seeks in this lawsuit to impose civil sanctions upon defendant employer for alleged violations of California’s FEHA, which prohibits invidious employment discrimination. Accordingly, the relevant federal immigration law does not expressly preempt California’s provisions, enacted by Senate Bill No. 1818, granting state employment law protections to all workers “regardless of immigration status.”
We now consider the second type of preemption — field preemption— which occurs either when the federal regulation is so pervasive as to leave no room for state regulation, or when the federal interest is “ ‘so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject’ ” (Arizona v. United States, supra, 567 U.S. at p. _ [132 S.Ct. at p. 2501], italics added). Some years before its Arizona decision, the United States Supreme Court addressed the dominant federal interest aspect of field preemption in De Canas, supra, 424 U.S. 351. At issue there was the constitutionality of a former California law (Lab. Code, former § 2805, enacted by Stats. 1971, ch. 1442, § 1, p. 2847, repealed by Stats. 1988, ch. 946, § 1, p. 3025) that prohibited employers from knowingly employing nonresident aliens if their employment adversely affected lawful resident workers. De Canas held that the federal interest in regulating employment of unauthorized aliens was not so dominant as to preclude state laws on the same subject (De Canas, at pp. 359-361), although the high court ultimately did not resolve the preemption issue, concluding that issues regarding the proper construction of the challenged state law needed to be resolved first by state courts (id. at pp. 364 — 365). Plaintiff employee here relies on this statement by the high court in De Canas: “States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety, and workmen’s compensation laws are only a few examples.” (Id. at p. 356.) Because De Canas dealt only *423 with the dominant federal interest aspect of field preemption, it did not address the federal regulation pervasiveness aspect, which is at issue here and which we explore below.
At the time of De Canas, federal immigration law expressed at best “a peripheral concern with employment of illegal entrants.” (De Canas, supra, 424 U.S. at p. 360, fn. omitted.) That changed 10 years after the high court’s 1976 De Canas decision, when Congress enacted the Immigration Reform and Control Act of 1986. That law, with its focus on employment of unauthorized aliens, “ ‘forcefully’ made combating the employment of illegal aliens central to ‘[t]he policy of immigration law.’ ” (Hoffman, supra, 535 U.S. at p. 147, quoting INS v. National Center for Immigrants’ Rights, Inc. (1991) 502 U.S. 183, 194 & fn. 8 [116 L.Ed.2d 546, 112 S.Ct. 551].) The question before us: Has federal immigration regulation now become so pervasive as to leave no room for state employment laws that extend antidiscrimination protections with lost pay remedies to employees who are unauthorized aliens?
The high court has recently pointed out, as noted earlier, that the states’ historic police powers are not preempted “ ‘unless that was the clear and manifest purpose of Congress’ ” (Arizona v. United States, supra, 567 U.S. at p._[132 S.Ct. at p. 2501]), and it has acknowledged that regulation of the employment relationship is within the states’ police powers (De Canas, supra, 424 U.S. at p. 356). The parties here have not cited, nor has our research disclosed, evidence of a clear and manifest purpose by Congress to occupy the field of immigration regulation so completely as to preclude the states from applying to unauthorized aliens the states’ own worker protection labor and employment laws. A conclusion that Congress has occupied the field would dramatically affect state laws such as those regulating workers’ compensation, minimum wages, working hour limits, and worker safety. We therefore conclude that the federal regulation imposed by the Immigration Reform and Control Act of 1986 is not so pervasive as to leave no room for any state law on the same subject.
We now address the third type of federal preemption — conflict preemption — which occurs when state law conflicts with federal law either because compliance with both laws is impossible or because state law is an obstacle to achieving the federal law’s objectives. (Arizona v. United States, supra, 567 U.S. at p._[132 S.Ct. at p. 2501].) We first consider whether compliance with both federal and state laws is impossible. This inquiry requires us to distinguish here between (1) the period dating from the occurrence of the employer’s alleged wrongful act until the employer’s discovery of the employee’s ineligibility under federal immigration law to work in the United States (the prediscovery period) and (2) the period after *424 the employer’s discovery of that ineligibility (the postdiscovery period). This distinction is called for because the federal Immigration Reform and Control Act of 1986 prohibits an employer from continuing to employ an unauthorized alien upon discovery of the worker’s unauthorized status. (8 U.S.C. § 1324a(a)(2); Hoffman, supra, 535 U.S. at p. 148.)
We first consider the postdiscovery period. Because under federal immigration law an employer may not continue to employ a worker known to be ineligible (8 U.S.C. § 1324a(a)(2)), any state law award that compensates an unauthorized alien worker for loss of employment during the postdiscovery period directly conflicts with the federal immigration law prohibition against continuing to employ workers whom the employer knows are unauthorized aliens. Such an award would impose liability on the employer for not performing an act (continuing to employ a worker known to be an unauthorized alien) expressly prohibited by federal law.[3] Thus, federal law preempts state Senate Bill No. 1818 to the extent that it makes a California FEHA lost pay award available to an unauthorized alien worker for the postdiscovery period.[4]
We now turn to the prediscovery period. In allowing lost wages for that period, our state labor laws do not directly conflict with the federal Immigration Reform and Control Act of 1986 because compliance with both federal and state laws is not impossible, as we now explain. Although federal immigration law prohibits an unauthorized alien’s use of any false document to get a job (8 U.S.C. § 1324c(a)(l)-(3)), that law does not prohibit an employer from paying, or an employee from receiving, wages earned during employment wrongfully obtained by false documents, so long as the employer remains unaware of the employee’s unauthorized status. Thus, allowing recovery of lost wages for the prediscovery period does not produce an *425 “inevitable collision between the two schemes of regulation.” (Florida Avocado Growers v. Paul (1963) 373 U.S. 132, 143 [10 L.Ed.2d 248, 83 S.Ct. 1210].)
(11) We now consider conflict preemption’s remaining aspect — also known as obstacle preemption — which exists when the state regulation would frustrate the federal law’s purpose. Whether there is obstacle preemption is determined by “examining the federal statute as a whole and identifying its purpose and intended effects.” (Crosby v. National Foreign Trade Council (2000) 530 U.S. 363, 373 [147 L.Ed.2d 352, 120 S.Ct. 2288].) If the federal law’s purpose cannot otherwise be achieved, “ ‘the state law must yield to the regulation of Congress within the sphere of its delegated power.’ ” {Ibid.)
The Immigration Reform and Control Act of 1986, at issue here, is “a comprehensive scheme prohibiting the employment of [unauthorized] aliens in the United States.” {Hoffman, supra, 535 U.S. at p. 147.) To achieve the goal of eliminating employment of unauthorized aliens, federal law requires employers to verify that prospective employees are eligible to work in the United States (8 U.S.C. § 1324a(b)), prohibits employers from hiring those unable to provide documents establishing employment eligibility {id., § 1324a(a)(l)), and compels employers to immediately discharge any unauthorized alien worker upon discovery of the worker’s unauthorized status (id., § 1324a(a)(2)). Employers violating these federal law provisions are subject to an escalating series of civil penalties {id., § 1324a(e)(4)(A)), as well as potential criminal prosecution {id., § 1324a(f)(l)).
Far less stringent, however, is federal immigration law’s approach to unauthorized alien workers. Although Congress made it a crime for an unauthorized alien to use false documents to obtain employment (18 U.S.C. § 1546(b)), Congress did not impose criminal sanctions on unauthorized aliens merely for seeking or engaging in unauthorized work. As the high court recently pointed out, “Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment,” as this “would be inconsistent with federal policy and objectives.” (Arizona v. United States, supra, 567 U.S. at p._[132 S.Ct. at p. 2504].)
California’s Senate Bill No. 1818 expressly makes the worker protection provisions of state employment and labor laws available to all workers “regardless of immigration status.” The protections thus extend even to those unauthorized aliens who, in violation of federal immigration law, have used false documents to secure employment. Even if permitting those workers to obtain state remedies for violations of the state labor and employment laws provides an incentive for such federal law violations, the practical effect of such incentive is minimal because the typical unauthorized *426 alien wage earner is not familiar with the state law remedies available for unlawful termination and because jobseekers rarely contemplate being terminated in violation of the law. Thus, it is highly unlikely that an unauthorized alien’s decision to seek employment in this country would be based in any significant part on the availability of lost wages as a remedy for unlawful discharge. Any unauthorized aliens who did consider this remedy would also realize that by pursuing state law remedies after termination they would risk discovery of their unauthorized status, thereby exposing them to criminal prosecution under both federal law (18 U.S.C. § 1546(b)) and state law (Pen. Code, § 114) and to deportation. (See Grocers Supply, Inc. v. Cabello (Tex.Ct.App. 2012) 390 S.W.3d 707, 719 [stating that “potential damage awards are not meaningful incentives to draw illegal immigrants into this country”].)
Furthermore, not allowing unauthorized workers to obtain state remedies for unlawful discharge, including prediscovery period lost wages, would effectively immunize employers that, in violation of fundamental state policy, discriminate against their workers on grounds such as disability or race, retaliate against workers who seek compensation for disabling workplace injuries, or fail to pay the wages that state law requires. The resulting lower employment costs would encourage employers to hire workers known or suspected to be unauthorized aliens, contrary to the federal law’s purpose of eliminating employers’ economic incentives to hire such workers by subjecting employers to civil as well as criminal penalties. (See Sure-Tan, Inc. v. NLRB (1984) 467 U.S. 883, 893-894 [81 L.Ed.2d 732, 104 S.Ct. 2803] [recognizing that enforcing labor laws on behalf of undocumented aliens reduces an employer’s incentive to unlawfully hire them]; Reyes v. Van Elk, Ltd. (2007) 148 Cal.App.4th 604, 617 [56 Cal.Rptr.3d 68] [“Allowing employers to hire undocumented workers and pay them less than the wage mandated by statute is a strong incentive for the employers to do so, which in turn encourages illegal immigration.”]; Farmer Brothers Coffee v. Workers’ Comp. Appeals Bd. (2005) 133 Cal.App.4th 533, 540 [35 Cal.Rptr.3d 23] [if unauthorized aliens were to be denied state labor law protections, “unscrupulous employers would be encouraged to hire aliens unauthorized to work in the United States, by taking the chance that the federal authorities would accept their claims of good faith reliance upon immigration and work authorization documents that appear to be genuine”].) It would frustrate rather than advance the policies underlying federal immigration law to leave unauthorized alien workers so bereft of state labor law protections that employers have a strong incentive to “look the other way” and exploit a black market for illegal labor. Accordingly, after comparing the likely effects of applying and not applying state labor and employment law protection to unauthorized alien workers, we conclude that Senate Bill No. 1818, insofar as it makes available to such workers the remedy of prediscovery period lost *427 wages for unlawful termination in violation of the FEHA, does not frustrate the purpose of the federal Immigration Reform and Control Act of 1986, and thus is not preempted.
Ill
Plaintiff employee challenges the Court of Appeal’s holdings that the doctrines of after-acquired evidence and unclean hands are complete defenses to plaintiff’s action against defendant employer. Before addressing plaintiff’s challenges, we consider whether the Legislature, when it enacted Senate Bill No. 1818, adopted the reasoning of two Court of Appeal decisions addressing the application of those doctrines in employment termination cases.
A. Senate Bill No. 1818 and Then Existing Law
The California Legislature enacted Senate Bill No. 1818 in 2002. As we have noted (see ante, at pp. 419-420), that law was a direct response to the high court’s 2002 decision in Hoffman, supra, 535 U.S. 137, to ensure that in California unauthorized alien workers would continue to have the same protections and remedies (apart from reinstatement when prohibited by federal law) afforded other workers under California’s employment and labor laws. The 2002 legislation, the Legislature said at the time of enactment, is “declaratory of existing law.” (Civ. Code, § 3339, subd. (c); Gov. Code, § 7285, subd. (c); Health & Saf. Code, § 24000, subd. (c); Lab. Code, § 1171.5, subd. (c).) Focusing on this just-quoted language, the Court of Appeal here relied on two Court of Appeal decisions in existence at the time of the 2002 legislation’s enactment: the 1995 decision in Camp v. Jeffer, Mangels, Butler & Marmaro (1995) 35 Cal.App.4th 620 [41 Cal.Rptr.2d 329] (Camp), and the 1998 decision in Murillo v. Rite Stuff Foods, Inc. (1998) 65 Cal.App.4th 833 [77 Cal.Rptr.2d 12] (Murillo). The Court of Appeal here read Camp and Murillo broadly as creating a complete defense based on after-acquired evidence, a view that, according to the Court of Appeal, the Legislature had adopted in enacting Senate Bill No. 1818.
We are not persuaded by the Court of Appeal’s reasoning on this point. Why would the Legislature have focused only on those two Court of Appeal decisions (which provided support for the Court of Appeal’s holding here on the issue of after-acquired evidence) while ignoring another Court of Appeal decision, Cooper v. Rykoff-Sexton, Inc. (1994) 24 Cal.App.4th 614 [29 Cal.Rptr.2d 642], which held that after-acquired evidence was not a defense to a wrongful termination action alleging age discrimination?
Lacking is any indication that when the California Legislature enacted Senate Bill No. 1818 in 2002, it intended to endorse or codify the decisions *428 in Camp, supra, 35 Cal.App.4th 620, and Murillo, supra, 65 Cal.App.4th 833, which specifically deált with the doctrine of after-acquired evidence. No mention of that doctrine appeared in Senate Bill No. 1818.
There is another, more persuasive explanation for the Legislature’s statement that Senate Bill No. 1818 is “declaratory of existing law”: “[W]here a statute provides that it clarifies or declares existing law, ‘[i]t is obvious that such a provision is indicative of a legislative intent that the amendment apply to all existing causes of action from the date of its enactment’ ” (Western Security Bank v. Superior Court (1997) 15 Cal.4th 232, 244 [62 Cal.Rptr.2d 243, 933 P.2d 507]), although such a statement of intent is “ ‘not binding’ ” on the courts {ibid.). Thus, we infer here that the Legislature intended to extend to cases predating Senate Bill No. 1818’s enactment that statute’s central directive that state law protections should extend to all employees “regardless of immigration status.” Nothing in the statute states or implies that its central directive would not apply to any unauthorized alien who used false documentation to obtain employment.
We now consider the applicability here of the doctrine of after-acquired evidence.
B. After-acquired Evidence
The doctrine of after-acquired evidence refers to an employer’s discovery, after an allegedly wrongful termination of employment or refusal to hire, of information that would have justified a lawful termination or refusal to hire. (See White & Brussack, The Proper Role of After-acquired Evidence in Employment Discrimination Litigation (1993) 35 B.C. L.Rev. 49; Rubinstein, The Use of Predischarge Misconduct Discovered After an Employee’s Termination as a Defense in Employment Litigation (1990) 24 Suffolk U. L.Rev. 1.)
Here, plaintiff sued his employer for allegedly violating California’s FEHA. During the litigation, defendant employer obtained information suggesting that plaintiff had used another person’s Social Security number to obtain employment with defendant. The Court of Appeal agreed with defendant that the after-acquired evidence completely barred plaintiff’s claims. Plaintiff challenges that holding, arguing that it fails to give effect to the strong public policies contained in the FEHA.
Pertinent here is the high court’s decision in McKennon v. Nashville Banner Publishing Co. (1995) 513 U.S. 352 [130 L.Ed.2d 852, 115 S.Ct. 879] (McKennon), which was cited by both parties and the Court of Appeal. At issue in McKennon was whether after-acquired evidence provided a complete *429 defense to an employee’s claim that she was terminated in violation of the federal Age Discrimination in Employment Act of 1967 (ADEA; 29 U.S.C. § 621 et seq.). Resolving a conflict among the federal courts of appeals (compare Summers v. State Farm Mut. Auto. Ins. Co. (10th Cir. 1988) 864 F.2d 700 with Kristufek v. Hussmann Foodservice Co. (7th Cir. 1993) 985 F.2d 364), the high court held that after-acquired evidence does not bar all relief under the federal ADEA, although such evidence can limit the remedies granted to the employee. (McKennon, at pp. 361-362.)
McKennon observed that the federal ADEA sought to eliminate discrimination in the workplace and that a private litigant seeking redress vindicates the ADEA’s important public policy against discriminatory employment practices. McKennon reasoned that allowing after-acquired evidence to completely bar relief in such cases would be inconsistent with the federal statutory scheme and would impair the efficacy of the ADEA’s enforcement mechanism. (McKennon, supra, 513 U.S. at pp. 358-359.)
The high court in McKennon nevertheless determined that some legitimate concerns of the employer justified taking the employee’s wrongdoing into account in fashioning remedies. (McKennon, supra, 513 U.S. at pp. 360-361.) “In determining appropriate remedial action, the employee’s wrongdoing becomes relevant not to punish the employee, or out of concern ‘for the relative moral worth of the parties’ [citation], but to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee’s wrongdoing.” (Id. at p. 361.)
McKennon held that, because “the factual permutations and the equitable considerations they raise will vary from case to case,” the proper remedial relief would need to be “addressed by the judicial system in the ordinary course of further decisions.” (McKennon, supra, 513 U.S. at p. 361.) The scope of the remedy, noted the high court, generally does not include reinstatement. (Id. at pp. 361-362.) With regard to the remedy of backpay, the high court remarked: “Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit. The beginning point in the trial court’s formulation of a remedy should be calculation of backpay from the date of the unlawfid discharge to the date the new information was discovered.” (Id. at p. 362, italics added.) Thus, the high court rejected an “absolute rule barring any recovery of backpay,” because such a rule “would undermine the ADEA’s objective of forcing employers to consider and examine their motivations, and of penalizing them for employment decisions that spring from age discrimination.” (Ibid.)
*430 The high court’s reasoning in McKennon applies with equal force to plaintiff employee’s claim here that the employer violated plaintiff’s rights under California’s FEHA. That state law seeks “to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status.” (Gov. Code, § 12920; see id.., § 12940, subd. (a) [unlawful employment practice for employer to refuse to hire or to discharge a person on any of these bases].) Achievement of that antidiscrimination goal would be substantially impaired if the doctrine of after-acquired evidence were a complete defense to claims of retaliation and disability discrimination brought under the FEHA. By definition, after-acquired evidence is not known to the employer at the time of the allegedly unlawful termination or refusal to hire. (McKennon, supra, 513 U.S. at pp. 359-360 [distinguishing after-acquired evidence cases from mixed motive cases in which the employer at the time of the employment action has two or more motives, at least one of which is unlawful].) In after-acquired evidence cases, the employer’s alleged wrongful act in violation of the FEHA’s strong public policy precedes the employer’s discovery of information that would have justified the employer’s decision. To allow such after-acquired evidence to be a complete defense would eviscerate the public policies embodied in the FEHA by allowing an employer to engage in invidious employment discrimination with total impunity.
It does not follow, however, that the doctrine of after-acquired evidence has no bearing on employment discrimination and retaliation claims brought under California’s FEHA. As the high court observed in McKennon, “the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee’s wrongdoing” are entitled to recognition. (McKennon, supra, 513 U.S. at p. 361.) In after-acquired evidence cases, therefore, both the employee’s rights and the employer’s prerogatives deserve recognition. The relative equities will vary from case to case, depending on the nature and consequences of any wrongdoing on either side, a circumstance that counsels against rigidity in fashioning appropriate remedies in those actions where an employer relies on after-acquired evidence to defeat an employee’s FEHA claims.
Generally, the employee’s remedies should not afford compensation for loss of employment during the period after the employer’s discovery of the evidence relating to the employee’s wrongdoing. When the employer shows that information acquired after the employee’s claim has been made would have led to a lawful discharge or other employment action, remedies such as reinstatement, promotion, and pay for periods after the employer learned of such information would be “inequitable and pointless,” as they grant remedial *431 relief for a period during which the plaintiff employee was no longer in the defendant’s employment and had no right to such employment. (McKennon, supra, 513 U.S. at p. 362.)
The remedial relief generally should compensate the employee for loss of employment from the date of wrongful discharge or refusal to hire to the date on which the employer acquired information of the employee’s wrongdoing or ineligibility for employment.[5] Fashioning remedies based on the relative equities of the parties prevents the employer from violating California’s FEHA with impunity while also preventing an employee or job applicant from obtaining lost wages compensation for a period during which the employee or applicant would not in any event have been employed by the employer. In an appropriate case, it would also prevent an employee from recovering any lost wages when the employee’s wrongdoing is particularly egregious.
Here, the trial court initially denied defendant employer’s motion for summary judgment because of a triable issue of material fact as to whether defendant employer continued to employ plaintiff worker after being put on notice that his name did not match the Social Security number he had provided. The Court of Appeal concluded there was no triable issue of fact because a mere mismatch could have an innocent explanation and was not necessarily inconsistent with the evidence that defendant employer had a settled policy of refusing to hire applicants who submitted false Social Security numbers.
We agree with the trial court. According to plaintiff’s declaration, defendant’s production manager, Leo Huizar, after learning that several employees had supplied incorrect Social Security numbers, assured them they would not be terminated as long as the company’s president was satisfied with their work. This evidence, if true, would support a finding that defendant employer deliberately chose to look the other way when put on notice of employees’ unauthorized status. Such a finding could affect application of the after-acquired evidence doctrine and thus the remedies available to plaintiff employee.
*432 We now consider the applicability of the doctrine of unclean hands to such claims.
C. Unclean Hands
Generally, the equitable doctrine of unclean hands applies when a plaintiff has acted unconscionably, in bad faith, or inequitably in the matter in which the plaintiff seeks relief. (Precision Co. v. Automotive Co. (1945) 324 U.S. 806, 814-815 [89 L.Ed. 1381, 65 S.Ct. 993]; General Elec. Co. v. Superior Court (1955) 45 Cal.2d 897, 899-900 [291 P.2d 945]; 13 Witlcin, Summary of Cal. Law (10th ed. 2005) Equity, § 9, p. 289.) “ ‘The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants.’ ” (Camp, supra, 35 Cal.App.4th at pp. 638-639.) If the required showing is made, unclean hands may be a complete defense to legal as well as equitable causes of action. (Mendoza v. Ruesga (2008) 169 Cal.App.4th 270, 279 [86 Cal.Rptr.3d 610].)
Equitable defenses such as unclean hands may not, however, be used to wholly defeat a claim based on a public policy expressed by the Legislature in a statute. (See Cortez v. Purolator Air Filtration Products Co. (2000) 23 Cal.4th 163, 179 [96 Cal.Rptr.2d 518, 999 P.2d 706]; Mendoza v. Ruesga, supra, 169 Cal.App.4th at pp. 279-280; 13 Witkin, Summary of Cal. Law, supra, Equity, § 3, p. 285, § 15, p. 301.) Nevertheless, equitable considerations may guide the court in fashioning relief in cases involving a legislatively expressed public policy. This court recognized that when it stated in Angelucci v. Century Supper Club (2007) 41 Cal.4th 160, 179 [59 Cal.Rptr.3d 142, 158 P.3d 718]: “Although equitable principles may not be applied in opposition to statutory enactments or to defeat public policy established by the Legislature [citations], such principles have been applied to reduce ordinary tort damages imposed for violation of antidiscrimination laws. [Citations.]”
Accordingly, the Court of Appeal here erred in treating the doctrine of unclean hands as a complete defense to plaintiff’s lawsuit, an action founded upon public policies established by the Legislature in the FEHA.
Disposition
The judgment of the Court of Appeal is reversed, with directions to remand the matter to the trial court for further proceedings consistent with this opinion.
Cantil-Sakauye, C. 1, Werdegar, J., Corrigan, L, and Liu, L, concurred.

 Because the issue involves federal immigration law, we here use that law’s terminology. The Immigration Reform and Control Act of 1986 defines “alien” as “any person not a citizen or national of the United States” (8 U.S.C. § 1101(a)(3)) and states that “the term ‘unauthorized alien’ means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General” (id., § 1324a(h)(3)).

 The language of Civil Code section 3339 and Government Code section 7285 is the same. The language of the other two provisions- — Health and Safety Code section 24000 and Labor Code section 1171.5 — differs only in the wording of subdivision (b). While Civil Code section 3339 and Government Code section 7285 refer to “state labor, employment, civil rights, and employee housing laws,” Health and Safety Code section 24000 and Labor Code section 1171.5 both refer only to “state labor and employment laws.”

 Our preemption analysis for the postdiscovery period is limited to employers who discover the plaintiff employee’s unauthorized status after the employee has been discharged or not rehired. Not addressed here is a situation in which an employer has knowingly hired or continued to employ an unauthorized alien in violation of federal immigration law (see 8 U.S.C. § 1324a(a)(1) — (2)). Because imposing full liability for lost wages would provide a disincentive for such immigration law violations, thereby furthering the goals of federal immigration law, in these situations arguably federal law would not preempt lost wages remedies for violations of state laws like California’s FEHA.

 California’s Senate Bill No. 1818 makes available “[a]ll protections, rights, and remedies available under state law” relating to employment (except for any reinstatement remedy prohibited by federal law) “regardless of immigration status.” Such state law remedies cover a wide range. For example, in an action alleging violation of California’s FEHA a worker may recover any “damages ‘generally available in noncontractual actions’ ” (State Dept. of Health Services v. Superior Court (2003) 31 Cal.4th 1026, 1042 [6 Cal.Rptr.3d 441, 79 P.3d 556]), including wages a wrongfully terminated worker would have earned absent the termination (see Mize-Kurzman v. Marin Community College Dist. (2012) 202 Cal.App.4th 832, 873, fn. 17 [136 Cal.Rptr.3d 259]).

 Defendant employer relies on language by the Court of Appeal in Farmer Brothers Coffee v. Workers’ Comp. Appeals Bd., supra, 133 Cal.App.4th at page 541, that “backpay is not recoverable by an employee who would not be rehired regardless of any employer misconduct.” In support, Farmer Brothers cited this court’s decision in Rivcom Corp. v. Agricultural Labor Relations Bd. (1983) 34 Cal.3d 743 [195 Cal.Rptr. 651, 670 P.2d 305] (Rivcom). Rivcom construed an order of the Agricultural Labor Relations Board directing compensation for losses incurred by employees “ ‘as the result’ ” of unlawful employer conduct as excluding employees who would not have been rehired under a legitimate hiring policy. (Id. at pp. 773-774.) But contrary to the broad language used in Farmer Brothers, this court in Rivcom did not announce a rule that an award of backpay is categorically excluded whenever reinstatement is not allowed as a remedy.