Filed 2/18/15 On remand from Supreme Court

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

RAYMOND E. HORNE,

      Plaintiff and Appellant,

v.

DISTRICT COUNCIL 16
INTERNATIONAL UNION OF
PAINTERS AND ALLIED TRADES,

      Defendant and Respondent.

A135470

(Alameda County Super. Ct.
No. RG 10534651)

This matter comes before us on remand from the California Supreme Court, which granted review of our previous decision in the case. After issuing its opinion in *Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407 (*Salas*), (cert. den. Dec. 8, 2014, ___ U.S. ___ [135 S.Ct. 755]), the Supreme Court transferred these proceedings back to our court for reconsideration in light of *Salas*. By order dated September 9, 2014, we vacated our prior decision and requested that the parties file supplemental briefing pursuant to California Rules of Court, rule 8.200(b)(1). Both parties have done so.

The genesis of this dispute is an employment discrimination action filed by appellant Raymond E. Horne (Horne) in which the trial court granted summary judgment in favor of respondent District Council 16 International Union of Painters and Allied Trades (District Council 16). In particular, the trial court held that—because Horne was unable to establish that he was qualified for the union organizer position he unsuccessfully sought—he had failed to state a prima facie case of racial discrimination in violation of the California Fair Employment and Housing Act (FEHA). (Gov. Code, § 12900 et seq.) On appeal, Horne contends that the trial court improperly considered

1

after-acquired evidence of a prior narcotics conviction in determining that he was ineligible for the organizer job. Horne also claims that, even if the after-acquired evidence was admissible, the trial court erred in concluding that the conviction disqualified Horne from employment as a union organizer. District Council 16, for its part, disagrees with Horne's assertions, argues that his discrimination claim is preempted by the federal Labor-Management Reporting and Disclosure Act (LMRDA), and seeks sanctions from Horne for filing a frivolous appeal. Upon due consideration, and in light of the holding and rationale in *Salas*, we reverse the judgment of the trial court. We also deny District Council 16's request for sanctions.

## I. BACKGROUND

### A. *Horne's Employment History*

District Council 16 is a labor organization comprising 16 local unions of drywall finishers, glaziers, painters, and floor coverers. One member union is Glaziers Local No. 718 (Local 718). Horne—an African-American male—was a glazier and a member of Local 718. Since 2004, he served as a member of the executive board of Local 718. Since 2006, he was an officer of, and the recording secretary for, that union. He was also a member of District Council 16 (or its predecessors) for many years.

District Council 16 employs more than 40 people in California. In 2009, Horne applied for an organizer position with District Council 16, without success. The man chosen to fill the position was white. In February 2010, Horne again applied for an organizer position with District Council 16. He was not hired, and the position was again filled by a white male.

In July 2010, Horne challenged District Council 16's decision not to hire him as a union organizer, arguing that it was made in violation of the anti-discrimination provisions of the union's constitution and bylaws. After hearing on July 29, 2010, District Council 16 concluded that no violation had occurred. Thereafter, Horne filed a complaint for racial discrimination with the California Department of Fair Housing and Employment and received a right-to-sue letter in August 2010.

2

**B.**     *The FEHA Litigation*

In September 2010, Horne filed this employment discrimination action, alleging that District Council 16's failure to hire him was based on his race. In January 2011, he filed his first amended complaint in the matter. During discovery, Horne admitted that he had been convicted of possession of narcotics for sale in April 1997, that he had served a prison term as a result, and that he was discharged from parole with respect to the conviction on May 30, 2003. Horne claimed, however, that his citizenship rights, which were revoked as a result of his criminal behavior, had been fully restored. Specifically, Horne asserted that his rights to vote and serve on a jury had been restored when he completed his parole in May 2003, although he admitted that he still did not possess the right to carry a firearm. At the time of its February 2010 failure to hire Horne, District Council 16 did not know about Horne's prior narcotics conviction: Neither it nor Local 718 had ever asked Horne if he had previously been convicted of a felony, and Horne had never volunteered the information.

In August and September 2011, having learned of Horne's conviction, District Council 16 demanded repeatedly that Horne dismiss his lawsuit. Specifically, it asserted that the LMRDA barred Horne from employment as an organizer because of his criminal record. (See 29 U.S.C. § 504(a) (Section 504(a)).)[1] District Council 16 argued that, since Horne was statutorily disqualified in 2010 from the union organizer position, he could not maintain a discrimination suit based on the union's failure to hire him in that

---

[1] Section 504(a) of the LMRDA provides in relevant part: "No person . . . who has been convicted of, or served any part of a prison term resulting from his conviction of, . . . violation of narcotics laws . . . shall serve or be permitted to serve . . . as an officer, director, trustee, member of any executive board or similar governing body, business agent, manager, organizer, employee, or representative in any capacity of any labor organization, . . . during or for the period of thirteen years after such conviction or after the end of such imprisonment, whichever is later, . . . unless prior to the end of such period . . . his citizenship rights, having been revoked as a result of such conviction, have been fully restored . . . ."

capacity.[2]  Horne did not know of the federal statute until it was brought to his attention during the course of this litigation.  He disputed District Council 16's claim that the statute rendered him ineligible for the union organizer position in 2010.

In September 2011, District Council 16 moved for summary judgment, arguing that undisputed facts established Horne's inability to lawfully occupy the organizer position he sought in 2010 and that this circumstance was fatal to his discrimination claim.  In support of its motion, District Council 16 asked the trial court to take judicial notice of November 2011 and January 2012 letters from the United States Department of Labor, Office of Labor-Management Standards (OLMS), which asserted that federal law rendered Horne ineligible for the union organizer position unless he had somehow obtained relief from the disability imposed by the federal statute.  A "fact sheet" issued by OLMS explaining its interpretation of the statutory prohibition in general terms was attached to one of the letters.  Opposing the motion for summary judgment, Horne objected to the proffered evidence of his prior conviction, asserting that District Council 16 could not rely on evidence obtained *after* its failure to hire to justify its employment decision.  He also objected to any consideration of the proffered OLMS evidence.

After hearing, the trial court granted District Council 16's motion for summary judgment.  It found that Horne was unable to establish a prima facie case of discrimination because he could not show that he was qualified for the job for which he applied.  Specifically, the trial court relied on after-acquired evidence that, at the time of the employment decision in 2010, federal law prohibited Horne from serving as a union organizer.  It further found that the 13-year disability period established by that federal statute had not been shortened—that is, Horne's citizenship rights had not been fully restored—because he did not have a right to carry a firearm.  In reaching these conclusions, the trial court necessarily rejected Horne's objections to the evidence of his

---

[2] To support this assertion, District Council 16 cited, among other things, the Third District's opinion in *Salas v. Sierra Chemical Co.* (2011) 198 Cal.App.4th 29, superseded and reversed after grant of review by *Salas*, *supra*, 59 Cal.4th 407.

4

prior conviction and the OLMS evidence. In April 2012, Horne's case was dismissed. His timely notice of appeal followed.

## II. DISCUSSION

**A.** *Framework for Analysis and Standard of Review*

Horne contends that the trial court erred in granting summary judgment to District Council 16 on his cause of action for failure to hire. In his first amended complaint, Horne alleged that District Council 16's decision not to hire him was racially motivated. (See Gov. Code, § 12940, subd. (a).) In California, the FEHA makes it unlawful for an employer to refuse to hire an applicant for this reason. (Gov. Code, § 12940, subd. (a); *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 148 (*Sada*).)

Although Horne alleged a cause of action for discrimination in violation of state law, the similar purposes and objectives of the FEHA and title VII of the federal Civil Rights Act of 1964 allow California courts to look to pertinent federal precedent when applying our state law. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*); *Sada, supra,* 56 Cal.App.4th at p. 148; see 42 U.S.C. § 2000e-2(a)(1); Gov. Code, § 12940, subd. (a).) Specifically, California has adopted the three-stage burden-shifting approach established by the United States Supreme Court for trying these types of discrimination claims. (*Guz, supra,* 24 Cal.4th at p. 354; *Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 159; see *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 252-260 (*Burdine*); *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802-805 (*McDonnell*).) Thus, Horne bears the initial burden to prove a prima facie case of discrimination by a preponderance of the evidence. (*Sada, supra,* 56 Cal.App.4th at p. 151; see *Burdine, supra,* 450 U.S. at pp. 252-253; *McDonnell, supra,* 411 U.S. at p. 802; *Guz, supra,* 24 Cal.4th at p. 354; *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 806 (*Horn*).) If he does so, then the burden shifts to District Council 16 to offer any legitimate, non-discriminatory reasons for failing to hire him. Thereafter, the trial court assesses whether any proffered reasons might be pretextual. (See *Burdine, supra,* 450 U.S. at p. 256; *Guz, supra,* 24 Cal.4th at pp. 355-356; *Horn, supra,* 72 Cal.App.4th at pp. 806-807.)

5

Before getting to the issue of District Council 16's motive, then, Horne must first establish his prima facie case. This initial burden is not meant to be an "onerous" one, but is designed merely "to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled." (*Guz, supra,* 24 Cal.4th at pp. 354-355, citing *Burdine*, *supra*, 450 U.S. at pp. 253-254.) Although the specific elements necessary to establish a prima facie case may vary depending of the underlying facts, "[g]enerally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra,* 24 Cal.4th at p. 355; see also *Burdine, supra,* 450 U.S. at pp. 253-254, fn. 6; *McDonnell, supra,* 411 U.S. at p. 802; *Sada, supra,* 56 Cal.App.4th at p. 149.) In the instant proceedings, as stated above, the trial court found that Horne did not establish a prima facie case because he failed to show that he was qualified for the union organizer position.

The adequacy of Horne's prima facie case was initially a question of law for the trial court to resolve. (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 201-202.) "On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz, supra,* 24 Cal.4th at p. 334.) A motion for summary judgment is properly granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) Put in the context of this particular case, we must determine whether District Council 16—as the party seeking summary judgment—has conclusively negated a necessary element of Horne's case, such that the union is entitled to summary judgment. (See *Guz, supra,* 24 Cal.4th at p. 334.) As we

6

conduct this analysis, any issues of statutory interpretation are also subject to our de novo review. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)

**B.      *Horne's Prima Facie Case***

Horne advances two reasons why the trial court erred in concluding that he had failed to establish the prima facie elements of his race discrimination claim. First, Horne asserts that, despite his 1997 narcotics conviction, he was not disqualified from employment as a union organizer in 2010, because, by that time, his citizenship rights had been fully restored within the meaning of Section 504(a) of the LMRDA. Second, Horne claims that the after-acquired evidence of his narcotics conviction should not have been used to negate the elements of his prima facie case, thereby completely foreclosing his discrimination claim. We address each argument in turn.

*1.      Restoration of Citizenship Rights*

As stated above, pursuant to Section 504(a), an individual convicted of certain enumerated crimes is barred for a 13-year period from holding various union positions, including employment as an organizer, "unless prior to the end of such period . . . his citizenship rights, having been revoked as a result of such conviction, have been fully restored . . . ." Horne argues that he was not disqualified from the union organizer job in 2010 because his citizenship rights were fully restored for purposes of Section 504(a) upon completion of his parole in 2003. District Council 16, in contrast, argues that Horne's citizenship rights have not been fully restored under that statute because his right to possess a firearm in California, which was revoked as a result of his felony conviction, has never been reinstated.

Preliminarily, we note that Horne objects to consideration of the OLMS evidence on restoration of citizenship rights which was judicially noticed by the trial court, at least to the extent it is offered for the truth of its contents. While we take judicial notice of the OLMS fact sheet and letters as public records, we do not accept the truth of the statements contained therein, which are obviously subject to dispute. (See Evid. Code, §§ 452, subd. (c), 459, subd. (a); *Herrera v. Deutsche Bank National Trust Co.* (2011) 196 Cal.App.4th 1366, 1375.) More importantly, we do not find the OLMS materials

offered particularly helpful as they do not actually reach the issue of whether Horne's citizenship rights have been fully restored for purposes of Section 504(a). For instance, the OLMS fact sheet simply states: "Citizenship rights that *may be* revoked and restored as the result of state criminal convictions *generally include* the rights of a state citizen in the jurisdiction of conviction to vote in public elections, to serve in public office, to sit on a jury, and to possess firearms" (italics added). Thus, it makes no definitive statement regarding the restoration of citizenship rights based on a California conviction. Further, the November 2011 opinion letter from OLMS says only that Horne is disqualified from holding various union positions for 13 years from the date of his conviction or the date of his release from any resulting imprisonment, whichever was later, unless his "citizenship rights were revoked as a result of such conviction and have been fully restored." This statement simply parrots the statutory language without resolving the question of statutory interpretation here at issue. Finally, the January 2012 OLMS opinion letter merely references the OLMS fact sheet and indicates an understanding that Horne's right to carry a firearm has not been restored, without reaching any conclusion as to the consequence of that fact. Under these circumstances, the OLMS materials supplied by District Council 16 are of little value in the resolution of this matter.

Nor do we find particularly useful the case law discussing the restoration of "civil rights" in the context of 18 U.S.C. § 922(g)(1) (Section 922(g)(1)), the federal statute criminalizing the possession of a firearm by a felon.[3] (See, e.g., *United States v. Andaverde* (9th Cir. 1995) 64 F.3d 1305 (*Andaverde*); *United States v.* Cassidy (6th Cir. 1990) 899 F.2d 543 (*Cassidy*); *Enos v. Holder* (E.D. Cal. 2012) 855 F.Supp.2d 1088.) When determining what constitutes a prior felony conviction for purposes of Section 922(g)(1), federal law looks to the "law of the jurisdiction in which the proceedings were held" and expressly excludes "[a]ny conviction which has been expunged, or set aside or

---

[3] At least one court has treated the terms "civil rights" and "citizenship rights" as interchangeable for purposes of the restoration analysis. (See *United States v. Cullison* (D.D.C. 2006) 422 F.Supp.2d 65, 73, fn. 13 (*Cullison*).) Because we do not find the Section 922(g)(1) precedent dispositive, we need not decide the issue here.

for which a person has been pardoned or *has had civil rights restored* . . . unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." (18 U.S.C. § 921(a)(20), italics added.) Although the federal statute does not define "civil rights" for purposes of this exemption, "courts have held . . . that the civil rights relevant under the above-quoted provision are the rights to vote, hold office, and serve on a jury." (*Logan v. United States* (2007) 552 U.S. 23, 28; see also *Andaverde*, *supra*, 64 F.3d at p. 1309.)

Horne argues that since the right to bear arms is not included within these identified civil rights, it is irrelevant to the determination of whether his citizenship rights have been restored for purposes of Section 504(a). However, Section 922(g)(1) excludes convictions for which a person "has had civil rights restored." (18 U.S.C. § 921(a)(20).) Section 504(a), in contrast, requires the *full* restoration of citizenship rights. Under such circumstances, prior cases analyzing Section 922(g)(1) are not persuasive with respect to the issue before us. (See *Cassidy*, *supra*, 899 F.2d at p. 549 [discussing restoration of civil rights in the context of Section 922(g)(1) as follows: "We do not read into the statutory language, however, a requirement that there be a 'full' restoration of rights. If Congress had intended a requirement of a complete restoration of all rights and privileges forfeited upon conviction, it could easily have so stated"].)

In fact, the parties have cited no authority, nor have we discovered any, discussing the meaning of Section 504(a)'s full restoration of citizenship rights in the context of a California criminal conviction. We note, however, that the federal sentencing guidelines applicable to Section 504(a) state that "a disqualified person whose citizenship rights have been fully restored to him or her *in the jurisdiction of conviction*, following the revocation of such rights as a result of the disqualifying conviction, is relieved of the disability." (18 USCS Appx § 5J1.1, italics added.) Moreover, in a case involving the Employee Retirement Income Security Act of 1974 (ERISA)—a statute which contains an employment disqualification provision identical to Section 504(a)—a federal district judge held that an individual convicted of *federal* crimes must show restoration of citizenship rights under *federal* law in order to be relieved of his employment disability.

9

(*Viverito v. Levi* (N.D. Ill. 1975) 395 F. Supp. 47, 48.) Although the *Viverito* plaintiff had state citizenship rights restored upon the successful termination of his probation, his federal citizenship rights—including his rights to sit on a jury and to possess firearms— had not been restored. (*Ibid.*) He therefore remained subject to employment disqualification under ERISA. (*Id.* at pp. 48-49.) The same result was reached in a similar case brought under Section 504(a), itself. (*Cullison*, *supra*, 422 F.Supp. at pp. 73-74 [noting that "the greater weight of the authority suggests that a state's restoration of citizenship rights does not restore citizenship rights lost pursuant to a federal conviction"].) Thus, it seems clear that the relevant inquiry under Section 504(a) is whether Horne's citizenship rights have been fully restored under California law.

This does not necessarily mean, however—as Horne urges—that only citizenship rights expressly recognized by the California Constitution are relevant to a restoration analysis under Section 504(a). In particular, Horne argues that, since the right to bear arms is not a right granted by the California Constitution, his inability to possess a firearm is irrelevant to the question of whether his citizenship rights have been fully restored in California for purposes of Section 504(a). (See *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 481 [noting that no mention is made in the California Constitution of the right to bear arms].) We disagree. As a citizen of the United States, Horne possesses an individual right to bear arms. (*McDonald v. City of Chicago* (2010) 561 U.S. 742, 748-750; *District of Columbia v. Heller* (2008) 554 U.S. 570, 595.) As a result of his 1997 felony narcotics conviction, Horne lost this right under California law. (Pen. Code, § 29800, subd. (a)(1).) And, all parties agree that it has not been restored. The most reasonable interpretation of the federal law precluding Horne's employment until his citizenship rights have been *fully* restored is that he must have reacquired, under relevant California law, *all* of the citizenship rights he lost pursuant to that law as a result of his conviction. We therefore conclude, applying the express language of Section 504(a), that Horne's citizenship rights were not fully restored at the time of the February 2010 employment decision because, under California law, he remained unable to possess a firearm.

10

## 2. *After-Acquired Evidence Doctrine*

District Council 16's summary judgment motion was based on the single argument that Horne could not establish a prima facie case of discrimination because he was disqualified under federal law from the union organizer position at issue due to his 1997 narcotics conviction. As stated above, the record is clear that District Council 16 was unaware of Horne's conviction in 2010 when it made its decision not to hire him as an organizer. It is similarly undisputed that Horne was unaware of the federal statute until it was brought to his attention during the course of this litigation. The parties have argued extensively regarding the appropriateness of using the "after-acquired" evidence of Horne's narcotics conviction to negate his prima facie case, thereby foreclosing all possibility for relief under the FEHA.[4] This dispute, however, was essentially put to rest in June 2014, when the California Supreme Court issued its opinion in *Salas*, holding, among other things, that "the doctrines of after-acquired evidence and unclean hands are not complete defenses to a worker's claims under California's FEHA, although they do affect the availability of remedies." (*Salas*, *supra*, 59 Cal.4th at p. 414.)

In *Salas*, the plaintiff (Salas) had worked on a seasonal basis for a number of years for Sierra Chemical Company (Sierra), a business which manufactures, packages and distributes chemicals for treating water, including swimming pool water. (*Salas*, *supra*, 59 Cal.4th at p. 415.) When demand for its products decreased in the fall and winter, Sierra typically laid off many of its production line employees. However, those laid-off workers were generally rehired in the spring when consumer demand increased. (*Ibid.*) Salas injured his back twice in 2006 and was, at times, only able to perform modified duties. He filed a worker's compensation claim with respect to his workplace injury. Thereafter, Salas was told by Sierra in 2007 that he would not be re-hired after the seasonal layoffs unless he obtained a doctor's release indicating that he had been

---

[4] "The doctrine of after-acquired evidence refers to an employer's discovery, *after* an allegedly wrongful termination of employment or refusal to hire, of information that would have justified a lawful termination or refusal to hire." (*Salas*, *supra*, 59 Cal.4th at p. 428.)

11

cleared for full duty. (*Id.* at p. 416.) In response, Salas filed suit against Sierra under the FEHA, claiming that Sierra failed to provide reasonable accommodations for his disability and that the chemical company's refusal to re-hire him was in retaliation for the filing of his workers compensation claim and for his being disabled. (*Id.* at pp. 416-417.)

While preparing for trial, Sierra investigated the authenticity of the documents Salas had provided to the company regarding his immigration status and eligibility to work in the United States. It discovered that Salas had apparently used another person's Social Security number when seeking employment with Sierra. (*Salas*, *supra*, 59 Cal.4th at pp. 415, 417.) Thereafter, Sierra filed a motion for summary judgment, arguing that it was entitled to judgment as a matter of law, under the legal doctrines of after-acquired evidence and unclean hands, based on Salas' fraudulent use of another person's Social Security information to obtain employment. (*Ibid.*) After the trial court ultimately granted Sierra's summary judgment motion, the appellate court affirmed, concluding that Salas' causes of action were barred under both the after-acquired evidence doctrine and the doctrine of unclean hands. (*Id.* at p. 418.)

The California Supreme Court reversed. With respect to the doctrine of after-acquired evidence, the high court observed that the FEHA "seeks 'to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status.' (Gov. Code, § 12920; see *id.*, § 12940, subd. (a) [unlawful employment practice for employer to refuse to hire or to discharge a person on any of these bases].)" (*Salas*, *supra*, 59 Cal.4th at p. 430.) It also noted that, "[i]n after-acquired evidence cases, the employer's alleged wrongful act in violation of the FEHA's strong public policy precedes the employer's discovery of information that would have justified the employer's decision." (*Ibid.*) Thereafter, adopting the reasoning of the United States Supreme Court in *McKennon v. Nashville Banner Publishing Co.* (1995) 513 U.S. 352 (*McKennon*), the *Salas* Court concluded that "[t]o

allow such after-acquired evidence to be a complete defense would eviscerate the public policies embodied in the FEHA by allowing an employer to engage in invidious employment discrimination with total impunity." (*Salas*, *supra*, 59 Cal.4th at p. 430.) Given all of these circumstances, the high court determined that after-acquired evidence cannot be used as an absolute bar to a worker's FEHA claims. (*Salas*, *supra*, 59 Cal.4th at p. 414.)

This does not mean, however, that after-acquired evidence has no relevance in a FEHA case. Rather, again relying on *McKennon*, the *Salas* Court went on to hold that after-acquired evidence should be considered when determining the appropriate remedies for a FEHA violation. Specifically, the Court declared: "In after-acquired evidence cases, . . . both the employee's rights and the employer's prerogatives deserve recognition. The relative equities will vary from case to case, depending on the nature and consequences of any wrongdoing on either side, a circumstance that counsels against rigidity in fashioning appropriate remedies in those actions . . . ." (*Salas*, *supra*, 59 Cal.4th at p. 430.) Under such a balancing of the equities, the high court concluded that remedies such as reinstatement, promotion, and back pay for periods after the employer learned of the after-acquired evidence would, generally speaking, be inappropriate. (*Id.* at pp. 430-431.) Rather, "[t]he remedial relief generally should compensate the employee for loss of employment from the date of wrongful discharge or refusal to hire to the date on which the employer acquired information of the employee's wrongdoing or ineligibility for employment." (*Id.* at p. 431.) In summary, the *Salas* Court opined: "Fashioning remedies based on the relative equities of the parties prevents the employer from violating California's FEHA with impunity while also preventing an employee or job applicant from obtaining lost wages compensation for a period during which the employee or applicant would not in any event have been employed by the employer. In an appropriate case, it would also prevent an employee from recovering any lost wages when the employee's wrongdoing is particularly egregious." (*Ibid.*)

Horne, unsurprisingly, argues that *Salas* is on all fours with the present case and mandates that that the trial court's grant of summary judgment be reversed. District

13

Council 16, in contrast, offers several arguments suggesting why the reach of *Salas* should be limited, none of which we find persuasive. For instance, District Council 16 attempts to distinguish *Salas* by arguing that the case did not consider the admission of after-acquired evidence in the context of the three-stage burden-shifting approach applicable in FEHA cases. While it is true that the case does not expressly address the burden-shifting analysis adopted in California , *Salas* unambiguously states that after-acquired evidence cannot be used to completely bar a worker's FEHA claims. (*Salas*, *supra*, 59 Cal.4th at p. 414.) Allowing such evidence to vitiate a plaintiff's prima facie case would do precisely that. Moreover, *Salas* makes clear that after-acquired evidence is only relevant in the damages phase of a FEHA proceeding. (*Id.* at pp. 414, 430-431.) Since the burden-shifting analysis is applicable solely in the liability phase, it was unnecessary for the *Salas* Court to specifically address the impact of its holding on that analysis. (See *Avina v. Target Corp*. (C.D. Cal. July 18, 2014) 2014 U.S. Dist. LEXIS 101470, pp. 22-23 [citing *Salas* for proposition that after-acquired evidence is only applicable in determining the particular remedies available to a plaintiff after a conclusive determination has been reached as to liability].) Rather, the clear import of *Salas* is that after-acquired evidence is simply irrelevant during all phases of the three-stage burden-shifting approach designed to establish liability.

Nor do we find availing District Council 16's attempt to distinguish *Salas* on various factual grounds. For instance, District Council 16 notes that, unlike Salas, Horne was not employed by District Council 16 for years despite his disqualifying criminal history, nor was he rehired repeatedly regardless of that history. District Council 16 also highlights the lack of any evidence in this case that it had a practice of violating Section 504(a) of the LMRDA. Finally, District Council 16 avers that the strong public policy to provide employment protections to undocumented workers does not apply in this case as there is no corresponding public policy interest in protecting convicted felons' rights to employment by labor organizations. We doubt that the state's strong interest in providing employment conditions free of invidious discrimination applies any less to citizens previously convicted of crimes than it does to undocumented workers. Moreover, we

14

could recite additional facts which, in contrast to those identified by District Council 16, would tend to support recovery by Horne if discrimination is ever proved (such as his apparent lack of knowledge that his employment as a union organizer would violate federal law). However, under *Salas'* clear mandate, none of these factors are relevant during the liability phase of this FEHA litigation and therefore cannot be used as a basis for denying Horne relief at this stage in the proceedings. (See *Salas*, *supra*, 59 Cal.4th at p. 431 [disputed facts related to after-acquired evidence "could affect application of the after-acquired evidence doctrine and thus *the remedies* available to plaintiff employee," italics added].) Instead, District Council 16's factual arguments would be more appropriately addressed—should a conclusive determination ever be reached as to liability—during the trial court's balancing of the equities for purposes of fashioning appropriate remedies.

The trial court in this case impermissibly relied on the after-acquired evidence of Horne's felony conviction to support its grant of summary judgment, concluding that, since Horne was not qualified for the position of union organizer in 2010, he could not establish a prima facie case of discrimination. This determination was clearly contrary to the *Salas* Court's express holding that after-acquired evidence cannot be used as an absolute bar to a worker's FEHA claims. (*Salas*, *supra*, 59 Cal.4th at p. 414.) Under such circumstances, the trial court's grant of summary judgment must be reversed.

## C. *Preemption*

As a final matter, we address District Council 16's argument—made in passing in its initial briefing and argued more vigorously in the wake of *Salas*—that Horne's discrimination claim, even if it would otherwise be permitted to proceed, is preempted by the LMRDA. In particular, District Council 16 asserts that these proceedings are subject to express preemption pursuant to subdivision (a) of section 532 of the LMRDA (Section 523(a)); that application of the FEHA to these facts conflicts with the LMRDA because it constitutes an obstacle to accomplishing federal objectives (obstacle preemption); and that the LMRDA also directly conflicts with the FEHA because, in the present context, compliance with both laws is impossible (direct conflict preemption). (Cf. *Salas*, *supra*,

15

59 Cal.4th at p. 421.)  In considering these varied arguments, we are mindful that "the presumption is *against* federal preemption of state law. In preemption analysis, therefore, 'courts should assume that "the historic police powers of the States" are not superseded "unless that was the clear and manifest purpose of Congress." ' " (*Ibid*, quoting *Arizona v. United States* (2012) 567 U.S. ___ [132 S.Ct. 2492, 2501].)

Turning first to District Council 16's express preemption claim, we note that the LMRDA has an express preemption provision, which states as follows:  "Except as explicitly provided to the contrary, nothing in this Act shall reduce or limit the responsibilities of any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or of any trust in which a labor organization is interested, under any other Federal law or under the laws of any State, and except as explicitly provided to the contrary, nothing in this Act shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or law of any State." (29 U.S.C. § 523(a).)  District Council 16 argues that this is a situation "explicitly provided to the contrary" for purposes of express preemption because Horne was expressly prohibited by Section 504(a) from employment as a union organizer.  We disagree.

As stated above, California law imposes a responsibility on employers, including labor organizations, to refrain from refusing to hire a prospective employee on the basis of race.  (Gov. Code, § 12940, subd. (a).)  Nothing in the LMRDA expressly limits the responsibilities of a labor organization to make hiring decisions free of racial discrimination.  (Cf. *Smith v. International Brotherhood of Electrical Workers* (2003) 109 Cal.App.4th 1637, 1653 (*Smith*) ["[n]othing in the LMRDA even remotely condones the practice of age or disability discrimination on the part of elected union officials"].)  Thus, "[b]ecause the LMRDA does not 'explicitly provide[] to the contrary,' these responsibilities are neither 'reduced' nor 'limited' by the provisions of the act."  (Fn. omitted.)  (Cf. *ibid*.)  Indeed, if anything, the LMRDA's catch-all anti-preemption provision compels the conclusion that Congress did not generally intend to preempt such state anti-discrimination laws.  (See *Brown v. Hotel & Rest. Employees & Bartenders*

16

*Inter. Union Local 54* (1984) 468 U.S. 491, 505-506 (*Brown*) [by "affirmatively preserving the operation of state laws," the LMRDA express preemption provision "indicates that Congress necessarily intended to preserve some room for state action concerning the responsibilities and qualifications of union officials"].)[5]

For similar reasons, we find equally unpersuasive District Council 16's assertion of obstacle preemption. Obstacle preemption "exists when the state regulation would frustrate the federal law's purpose." (*Salas*, *supra*, 59 Cal.4th at p. 425.) "Whether there is obstacle preemption is determined by 'examining the federal statute as a whole and identifying its purpose and intended effects.' [Citation.] If the federal law's purpose cannot otherwise be achieved, ' "the state law must yield to the regulation of Congress within the sphere of its delegated power." ' [Citation.]" (*Ibid*.)

Congress enacted the LMRDA "as remedial legislation intended to combat union corruption and protect the rights of union members." (*Cullison*, *supra*, 422 F.Supp.2d at pp. 66-67; see also *Finnegan v. Leu* (1982) 456 U.S. 431, 435-436 [the LMRDA was a "product of congressional concern with widespread abuses of power by union leadership;" the LMRDA's "primary objective" was to ensure that "unions would be democratically governed and responsive to the will of their memberships"].) In fact, the statute, itself, indicates that it was a reaction to "a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct." (29 U.S.C. § 401(b).) Thus, Congress enacted the provisions of the statute to "eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants, and their

---

[5] As District Council 16 correctly highlights, the final clause of Section 523(a) speaks in terms of rights and remedies available to "members of a labor organization" rather than to employees or prospective employees. (29 U.S.C. § 523(a).) We do not find this distinction particularly useful to our express preemption analysis. Regardless of whether or not Section 523(a) applies to Horne as a union member and/or as a prospective employee, it evinces a general intent not to preempt state laws absent an explicit statement to the contrary. No such explicit statement has been made with respect to state anti-discrimination laws.

17

officers and representatives." (29 U.S.C. § 401(c).) The actual provision of the LMRDA at issue in this case—Section 504(a)—attempts to further this general purpose "by preventing individuals convicted of specified crimes from pursuing employment with labor organizations in certain enumerated capacities." (*Cullison*, *supra*, 422 F.Supp.2d at p. 67; see 29 U.S.C. § 504(a).) As the *Cullison* court opined: "The point is that Congress intended to secure high standards of responsibility and ethical conduct in labor organizations by locking out, at least for a period of 13 years after conviction, those people who demonstrate an inability to abide by such standards, as evidenced by their commission of one of the specified crimes." (*Cullison*, *supra*, 422 F.Supp.2d at p. 68.)

It is hard to understand how the laudable purpose of the LMRDA—to hold labor organizations to high standards of responsibility and ethical conduct—would somehow be thwarted by allowing a prospective union employee to pursue a state-law claim for race discrimination against a labor union. In fact, far from frustrating the purpose of the LMRDA, allowing such claims would seem to advance the policies underlying the federal statute by requiring that hiring decisions by unions be made in an ethical and responsible manner. As the *Smith* court noted when concluding that the LMRDA did not preempt FEHA claims of age and disability discrimination: "It would be ironic indeed if a law enacted to curb 'abuses of power by union leadership' was used instead to protect such abuses." (*Smith*, *supra*, 109 Cal.App.4th at p. 1649, fn. omitted.) Similarly, in *Bloom v. Gen. Truck Drivers Union, Local 952* (9th Cir. 1986) 783 F.2d 1356 (*Bloom*), the Ninth Circuit found that a California wrongful termination cause of action brought by a former union employee who had been terminated for refusing to illegally alter a meeting's minutes to hide his superior's embezzlement was not preempted by the LMRDA. Noting that the state's interest in allowing a wrongful discharge action under these circumstances was strong, the *Bloom* court concluded that "[p]rotecting such a discharge by preempting a state cause of action based on it does nothing to serve union democracy or the rights of union members; it serves only to encourage and conceal such criminal acts and coercion by union leaders." (*Id.* at p. 1362.)

18

In *Salas,* the Supreme Court considered the applicability of obstacle preemption to Salas' FEHA claim and determined that neither the FEHA nor California's Senate Bill No. 1818—which extends the worker protection provisions of state employment and labor laws to all workers regardless of immigration status—frustrated the purposes of federal immigration law such that obstacle preemption was warranted. (*Salas*, *supra*, 59 Cal.4th at pp. 418-421, 425-427; see also Gov. Code, § 7285.) In reaching this conclusion, the *Salas* Court was swayed by the fact that "*not* allowing unauthorized workers to obtain state remedies for unlawful discharge . . . would effectively immunize *employers* that, in violation of fundamental state policy, discriminate against their workers on grounds such as disability or race." (*Salas*, *supra*, 59 Cal.4th at p. 426.) Moreover, the high court found it "highly unlikely" that an unauthorized alien's decision to seek employment using false documents in violation of federal law would be based in any significant way on the availability of state law remedies for unlawful discharge, especially since pursuing such remedies might lead to the discovery of his or her wrongdoing and subject him or her to criminal prosecution. (*Id.* at pp. 425-426.) In contrast, the Court saw a " 'strong incentive' " for employers to exploit a black market for illegal labor if such workers were not afforded state labor law protections, a situation which would "frustrate rather than advance" the policies underlying federal immigration law. (*Id.* at p. 426.)

The *Salas* Court's obstacle preemption analysis buttresses our conclusion that this is not a situation in which application of the FEHA would frustrate the purpose of the LMRDA, thereby mandating a finding of obstacle preemption.[6] Here, as in *Salas*, precluding FEHA remedies would effectively immunize employers that discriminate against their workers in violation of fundamental state policy. (Cf. *Salas*, *supra*, 59 Cal.4th at p. 426.) Moreover, as in *Salas*, it seems highly unlikely that an individual's

---

[6] Arguably, the potential preemption of state-law remedies could be analyzed under theories of obstacle preemption. However, we believe such remedy preemption is most appropriately discussed in the context of direct conflict preemption, which we consider in a later portion of this opinion.

19

decision to seek union employment in violation of Section 504(a) of the LMRDA would be based in any significant way on the availability of state law FEHA remedies, especially since pursuing such remedies might subject him or her to criminal prosecution. (Cf. *id.* at pp. 425-426.) While we agree with District Council 16 that the narrow scope and application of Section 504(a) makes it unlikely to create any measurable impact on the market for union labor, we nevertheless find that affording state labor law protections in this context would advance the policies underlying the LMDRA. Indeed, under the present circumstances, if Horne's FEHA claim was barred, District Council 16 would in effect be rewarded for its ignorance of Section 504(a)'s requirements and its failure to screen out disqualified applicants, an outcome which would clearly contravene the underlying purpose of the LMRDA.[7]

Finally, we address District Council 16's claim of direct conflict preemption. Such preemption occurs when state law conflicts with federal law such that compliance with both laws is impossible. (*Salas*, *supra*, 59 Cal.4th at p. 423.) In the present case, compliance with both the FEHA and Section 504(a) is, as a general matter, entirely possible, as a labor organization could both refuse to hire disqualified felons and make its hiring decisions free from any discrimination actionable under the FEHA.

However, in *Salas*, the Supreme Court discussed direct conflict preemption in the context of available remedies for a FEHA violation and found certain otherwise available

---

[7] District Council 16's attempt to distinguish this case from *Salas* based on the fact that there is no California law which expressly extends the worker protection provisions of state employment and labor laws to convicted felons is not well taken. Pursuant to section 12940 of the Government Code, it is unlawful "[f]or an employer, *because of the race*, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status *of any person*, *to refuse to hire* or employ *the person*." (Gov. Code, § 12940, subd. (a), italics added.) Clearly, "any person" includes citizens who have previously been convicted of a crime. Thus, a statute such as Senate Bill 1818 (which extends such protections to all workers regardless of immigration status) would be surplusage.

20

state-law remedies to be preempted by federal immigration law.  (*Salas*, *supra*, 59 Cal.4th at pp. 423-425.)  Specifically, the *Salas* Court distinguished between two timeframes:  "(1)  the period dating from the occurrence of the employer's alleged wrongful act until the employer's discovery of the employee's ineligibility under federal immigration law to work in the United States (the prediscovery period) and (2) the period *after* the employer's discovery of that ineligibility (the postdiscovery period)."  (*Id.* at pp. 423-424.)  Because federal immigration law makes it a crime for an employer to continue to employ a worker *known* to be an unauthorized alien, the Court concluded that any state law award that compensated such a worker for loss of employment during the postdiscovery period was preempted because it would be in direct conflict with federal law.  (*Id*. at p. 424 [noting that such an award would impose liability on an employer for failing to perform an act that is "expressly prohibited by federal law"].)

In contrast, the *Salas* Court found no direct conflict preemption for an award of lost wages during the prediscovery period.  The Court reasoned that—although an unauthorized alien worker who uses false documents to gain employment is guilty of violating federal immigration law—that federal law "does not prohibit an employer from paying, or an employee from receiving, wages earned during employment wrongfully obtained by false documents, so long as the employer remains unaware of the employee's unauthorized status.  Thus, allowing recovery of lost wages for the prediscovery period does not produce an 'inevitable collision between the two schemes of regulation.' "  (*Id*. at pp. 424-425.)

Applying the reasoning of *Salas* in the present case, we conclude that the LMRDA would preempt any award of lost wages (or other prospective remedy such as instatement or front pay) during the postdiscovery period.  Mirroring federal immigration law, Section 504(a) of the LMRDA make it a crime for an employer-labor organization to *knowingly* hire or retain an individual who is disqualified under the statute from holding certain enumerated union positions.  (See 29 U.S.C. § 504(a) ["[n]o person shall knowingly hire, retain, employ, or otherwise place any other person to serve in any capacity in violation of this subsection"]; see also *id*. § 504(b) [authorizing fines and

21

imprisonment for up to five years for willful violations of the statute].)  Thus, any such award would "impose liability on the employer for not performing an act . . . expressly prohibited by federal law" (*Salas, supra,* 59 Cal.4th at p. 424, fn. omitted) and would therefore directly conflict with the LMRDA.

The viability of a lost wages award for the prediscovery period is less clear. Arguably, permitting such an award for an individual who is disqualified by the LMRDA from holding the position sought would compensate that individual for wages that he or she could not lawfully have earned and could therefore also be seen as conflicting with federal law.  (Cf. *Hoffman Plastic Compounds, Inc. v. NLRB* (2002) 535 U.S. 137, 148-150 [backpay award by the NLRB to an illegal alien employee runs counter to policies underlying federal immigration law where "Congress has expressly made it criminally punishable for an alien to obtain employment with false documents"]; *Salas*, *supra*, 59 Cal.4th at p. 443 (conc. & dis. opn. of Baxter, J.) [noting his belief that any award of backpay should be "preempted and barred" because "California cannot award, as a remedy for wrongful termination under FEHA, lost wage damages to an alien who is unauthorized to work in this country, and who obtained the job at issue by submitting fraudulent eligibility documentation in direct criminal violation of federal immigration law"].)  The *Salas* majority, however, rejected this approach.

Focusing on the *employer* rather than any criminal wrongdoing by the *employee*, the *Salas* Court held that there was no direct conflict preemption because nothing in federal immigration law prohibited "an employer from paying, or an employee from receiving, wages earned during employment wrongfully obtained by false documents, so long as the employer remains unaware of the of the employee's unauthorized status." (*Salas*, *supra*, 59 Cal.4th at p. 424.)  Here, similarly, the LMRDA does not forbid the payment or receipt of wages for employment wrongfully obtained in violation of Section 504(a), where an employer is unaware of the statutory violation.  Moreover, while it might be possible to distinguish *Salas* from the current case because nothing in federal immigration law makes it a crime for an illegal alien to actually engage in unauthorized work, while Section 504(a) states that no disqualified individual "shall serve or be

22

permitted to serve" in the specified union positions, this seems a distinction without a difference. (See *Salas*, *supra*, 59 Cal.4th at p. 425; 29 U.S.C. § 504(a).) Under both scenarios, a backpay award for the prediscovery period would compensate an individual for wages that he or she earned in violation of federal law. In the immigration context, a violation of federal immigration law occurs when an unauthorized alien illegally presents false documents to obtain employment. (See *Salas*, *supra*, 59 Cal.4th at p. 425.) Similarly, under Section 504(a), if a disqualified individual serves or is permitted to serve in certain designated union positions, a violation of the LMRDA takes place. Nevertheless, in the prediscovery period, nothing in either statute prohibits an employer (ignorant of the true facts) from paying the unauthorized employee. Relying on the *Salas* Court's analysis of the issue, we therefore conclude that, under the facts of this case, an award for lost wages during the prediscovery period would not be barred under theories of direct conflict preemption.[8]

In sum, we hold that—other than with respect to certain *postdiscovery* period remedies—the FEHA is not preempted by Section 504(a) of the LMRDA. Further, although the trial court correctly concluded that Horne's citizenship rights had not been fully restored for purposes of Section 504(a), its grant of summary judgment in favor of District Council 16 must be reversed because consideration of the after-acquired evidence upon which the court based its decision was inappropriate during the liability phase of this FEHA litigation.

### III. DISPOSITION

The judgment is reversed. Given this outcome, Horne's appeal was clearly not frivolous, and thus we deny District Council 16's request for sanctions in the form of attorney's fees and costs. (See Cal. Rules of Court, rule 8.276(a); *Computer Prepared*

---

[8] We conclude in this case only that an award of prediscovery lost wages is not absolutely preempted by federal law. Of course, as previously discussed, any such remedy would be subject to a balancing of the equities based on the existence of the after-acquired evidence in this matter, and could, under appropriate circumstances, be limited or completely disallowed.

23

*Accounts, Inc. v. Katz* (1991) 235 Cal.App.3d 428, 434-440.)  Instead, as the prevailing party, Horne is entitled to his costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                                           _____

                                           REARDON, J.


We concur:


_____

RUVOLO, P. J.


_____

HUMES, J.*

*  Presiding Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:                        Alameda Superior Court


Trial Judge:                        Hon. Marshall Whitley


Counsel for Appellant:              Burton Employment Law
                                    Jocelyn Burton


Counsel for Respondents:            Weinberg Roger & Rosenfeld
                                    Jannah Vanessa Manansala