Filed 10/21/15  Bryant v. San Diego Electric Co. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DAVID BRYANT, | D066467 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2011-00091876-CU-WT-CTL) |
| SAN DIEGO GAS & ELECTRIC COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County,

Joan M. Lewis, Judge.  Affirmed in part and reversed in part.

Jones Day, Edward P. Swan, Jr., Richard J. Bergstrom III and Matthew J. Silveira

for Defendant and Appellant.

The Gilleon Law Firm, Daniel M. Gilleon and James C. Mitchell for Plaintiff and

Respondent.

David Bryant sued his former employer, San Diego Gas & Electric Company

(SDG&E), for wrongful termination in violation of public policy, retaliation based on

SDG&E's alleged violation of Labor Code section 1102.5, and penalties under the Labor

Code Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.). (Undesignated statutory references are to the Labor Code; all references to section 1102.5 are to former section 1102.5, as amended in 2003.) Bryant alleged that SDG&E wrongfully terminated his employment and retaliated against him because he raised concerns regarding SDG&E's collection practices. The jury awarded Bryant $860,234 in compensatory damages and $1,300,000 in punitive damages. The court also entered judgment for Bryant on his PAGA claim, awarding $7,500 to the Labor and Workforce Development Agency and $2,500 to Bryant.

SDG&E appeals, contending: (1) there was insufficient evidence to support Bryant's section 1102.5 retaliation and PAGA claims, (2) Bryant failed to exhaust his administrative remedies, (3) Bryant failed to prove representative harm as required by PAGA, (4) the trial court erred in failing to issue a statement of decision on the PAGA claim, (5) the trial court improperly excluded after acquired evidence, (6) a new trial is warranted due to instructional errors, and (7) the jury's punitive damages award should be reversed or reduced because there was insufficient evidence of malice and the amount was unconstitutionally excessive. SDG&E does not challenge the sufficiency of the evidence to support the jury's verdict that SDG&E wrongfully discharged Bryant in violation of public policy. We reverse the judgment as to Bryant's section 1102.5, subdivision (a) (section 1102.5(a)) and PAGA claims. We also reverse the punitive damages award. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Bryant worked at SDG&E as a field collections supervisor. In 2008 and 2009, Bryant complained to various supervisors that SDG&E employees were violating the California Public Utilities Commission's (CPUC) tariffs. The tariffs were guidelines established by the CPUC that SDG&E was required to follow when collecting payment from customers. Specifically, Bryant complained that collectors were not attempting to contact customers before delivering a final notice to disconnect service and SDG&E was improperly charging customers fees.

In 2009, Phillip Heiner, Bryant's supervisor, and Herman Aguilar, the field operations manager who supervised Heiner, suspended Bryant for a week without pay. The suspension resulted from an incident in which Bryant disconnected a customer's utilities when the customer assaulted a collector. According to Bryant, Heiner knew in advance what Bryant was going to do and Heiner allowed it to happen. Heiner included details of the incident in Bryant's performance review.

In June 2009, Bryant met with Aguilar about the suspension. At that meeting, Bryant complained about SDG&E's unlawful collection practices, provided examples of those violations, and stated that they could get SDG&E in trouble. Aguilar told Bryant that he had heard Bryant was difficult to deal with and did not take "no" for an answer. Aguilar continued by telling Bryant, "we're here to tell you right now that if you don't go along with this program, what these guys have already decided to do, it's already been implemented in standards, the next time we see you, we're going to fire you." Thereafter, Bryant continued to complain about the tariff violations.

3

In 2011, an SDG&E employee complained that Bryant had sexually harassed her. Nicole Galicia and Tina Chen-Peters from SDG&E's diversity department investigated the allegation against Bryant. During the investigation, Heiner reported that another employee had complained that Bryant bullied and intimidated him. Based on Heiner's statements, the diversity department expanded its investigation to include those issues. The diversity department interviewed 40 people, including employees and former employees. The diversity department found Bryant had a history of engaging in unprofessional behavior, including intimidation, inappropriate joking, favoritism, targeting select employees, using inappropriate nicknames for employees, and creating an uncomfortable work environment. Due to a lack of witnesses and the length of time that had passed, the diversity department was unable to substantiate the allegations of sexual harassment.

Chen-Peters and Galicia presented their findings to Jorge DaSilva, SDG&E's Director of Field Services, and Heiner. Chen-Peters and Galicia also had a separate meeting with James Boland, SDG&E's Director of Labor Relations and Human Resources, regarding the results of the investigation. Chen-Peters and Galicia recommended that SDG&E terminate Bryant's employment. Heiner agreed with the recommendation but did not ultimately make the decision to fire Bryant. Instead, Boland and DaSilva made the final decision to terminate Bryant's employment. Accordingly, SDG&E notified Bryant that his employment was terminated effective April 1, 2011, for gross misconduct in violation of the company's Code of Business Conduct.

4

Bryant sued SDG&E for wrongful termination in violation of public policy, retaliation based on SDG&E's violation of section 1102.5, and penalties under the PAGA. In general, Bryant alleged SDG&E terminated his employment because he complained about SDG&E's illegal collection practices. On his section 1102.5 cause of action, Bryant pursued claims under both subdivisions (a) and (c) of that section. On his section 1102.5(a) claim, Bryant argued SDG&E had a rule preventing employees from disclosing unlawful activity to a government agency. In particular, Bryant claimed Aguilar's statement to Bryant to either go along with the implemented collection practices or get fired constituted a rule preventing disclosure to a government agency. On his section 1102.5, subdivision (c) (section 1102.5(c)) claim, Bryant claimed SDG&E retaliated against him for refusing to participate in an illegal activity.

The jury found SDG&E wrongfully terminated Bryant in violation of public policy. The jury also found SDG&E violated section 1102.5(a) because SDG&E had a rule or policy which prevented Bryant from disclosing information to a government agency, and that rule or policy contributed to Bryant's termination. The jury, however, did not find that Bryant refused to participate in an illegal activity that would result in a violation of or noncompliance with a state rule or regulation. Thus, the jury rejected Bryant's section 1102.5(c) claim. In special verdict forms, the jury awarded Bryant $860,234 in compensatory damages and $1,300,000 in punitive damages. The jury did not apportion damages between Bryant's various claims. Similarly, the judgment after the trial did not break down damages by cause of action.

DISCUSSION

I. *Section 1102.5(a)*

A. General Legal Principles

"[S]ection 1102.5 is a whistleblower statute, the purpose of which is to 'encourag[e] workplace whistle-blowers to report unlawful acts without fearing retaliation.' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 287 (*Soukup*).) Accordingly, section 1102.5(a) makes it unlawful for an employer to "make, adopt, or enforce any *rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency*, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (Italics added.)

"When findings of fact are challenged in a civil appeal, we are bound by the familiar principle that 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We view the evidence most favorably to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. [Citation.] Substantial evidence is evidence of ponderable legal significance, reasonable, credible and of solid value. [Citation.] However, '[s]ubstantial evidence . . . is not synonymous with "any" evidence.' [Citation.] Instead, the evidence must be ' "substantial" proof of the essentials which the law requires.' " (*Oregel v. American Isuzu Motors, Inc*. (2001) 90 Cal.App.4th 1094, 1100.)

6

B. Rule, Regulation or Policy

SDG&E argues there was insufficient evidence to support the jury's findings on Bryant's section 1102.5(a) claim because there was no evidence that SDG&E had a "rule, regulation, or policy" preventing disclosure of information to a government agency. It contends Aguilar's statement to Bryant that Bryant would be fired if he did not go along with SDG&E's collection practices did not constitute a rule, regulation or policy because it was directed at Bryant alone and nothing suggested it applied generally to all employees. Bryant argues Aguilar's statement fits within the definitions of a rule, regulation, or policy. He also contends the jury could infer that Aguilar's statement applied to all employees because if it "was enforced against Bryant, a supervisory employee, it naturally follows this applied to other employees."

Because the parties disagree as to the meaning of the terms "rule," "regulation," and "policy" in section 1102.5(a), their dispute first requires us to engage in statutory construction, which is subject to de novo review on appeal. (*Heritage Residential Care, Inc. v. Division of Labor Standards Enforcement* (2011) 192 Cal.App.4th 75, 83.) " 'In the absence of a statutory definition, and there is none, or in the absence of an adjudicated definition, and we have found none, we must turn to the general principle that in the construction of a statute, words or phrases are construed according to the context and approved usage of language.' " (*Ibid.*) " 'When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word.' " (*Ibid*.)

Preliminarily, we note that we do not consider whether SDG&E had a *regulation* preventing disclosure to a government agency as the jury was not requested to and did not make this finding. Rather, in the special verdict form, the jury responded affirmatively to the question: "Did SDG&E make, adopt or enforce a *rule or policy* to prevent Bryant from disclosing information to a government agency where he had reasonable cause to believe the information disclosed a violation of or noncompliance by SDG&E with a state rule or regulation?" (Italics added.)

The Webster's Third New International Dictionary (Webster's), upon which both parties rely, defines "rule" as "a prescribed, suggested, or self-imposed guide for conduct or action: a regulation or principle" and "an accepted procedure, custom, or habit having the force of a regulation." (Webster's (1993) p. 1986.) Similarly, among the definitions of "rule" included in the Oxford English Dictionary Online (OED Online) is that it is "[a] regulation framed or adopted by an organization, institution, or other body for governing its conduct and that of its members; a precept or condition which must be fulfilled on pain of penalty or punishment. Often in *rules and regulations*." (OED Online (2015) <http://www.oed.com/view/Entry/168717> [as of Oct. 19, 2015], at def. 5.)

Webster's defines "policy" as "a definite course or method of action selected (as by a government, institution, group, or individual) from among alternatives and in the light of given conditions to guide and usu[ally] determine present and future decisions." (Webster's, *supra*, at p. 1754; see also *Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481, 485-486 [utilizing dictionary definition of "policy" to interpret section 1101].) OED Online defines a "policy" as "[a] principle or course of action adopted or

8

proposed as desirable, advantageous, or expedient; *esp*[*ecially*] one formally advocated by a government, political party, etc.  Also as a mass noun: method of acting on matters of principle, settled practice."  (OED Online, *supra*, <http://www.oed.com/view/Entry/146842> [as of Oct. 19, 2015], at def. 4.)

In our view, a plain reading of the definitions of rule and policy suggests that they must be intended to apply generally to a group or class, rather than to one of many members of a group or class.  For example, a "rule" is adopted by an organization to "govern[] its conduct and that of its *members*" (OED Online, *supra*, <http://www.oed.com/view/Entry/168717> [as of October 19, 2015], at def. 5) and is an "accepted procedure . . . having the force of a regulation."  (Webster's, *supra*, at p. 1986.)  The definition of "policy" also suggests it has widespread application as it is "a definite course or method of action" adopted by a group or institution "to guide . . . present and future decisions."  (Webster's, *supra*, at p. 1754.)  These dictionary definitions comport with the commonly understood meaning of rules and policies in the context of an employer and employee relationship.

Our interpretation is also consistent with section 1102.5's purpose to encourage workplace whistleblowers to report unlawful acts without fear of retaliation.  (*Soukup*, *supra*, 39 Cal.4th at p. 287.)  Preventing an employer from making, adopting or enforcing rules and policies that have general application to all employees promotes this purpose whereas punishing a statement directed at only one of many employees in a group or class does not overall encourage employees to act as whistleblowers.

Here, Bryant's section 1102.5(a) claim was based on Aguilar's statement to Bryant that if Bryant did not go along with SDG&E's implemented collection practices, SDG&E would fire Bryant. Specifically, Aguilar told Bryant, "we're here to tell you right now that if you don't go along with this program, what these guys have already decided to do, it's already been implemented in standards, the next time we see you, we're going to fire you." This statement does not constitute a rule or policy under section 1102.5(a) as it was directed specifically at Bryant. There is no indication that Aguilar's statement applied to SDG&E's employees in general or to a group or class of employees of which Bryant was a member.

Even if Aguilar's statement was a rule or policy, it also fails to meet the requisites of section 1102.5(a) as it did not pertain to disclosure of information to a government agency. Rather, Aguilar's statement forced Bryant to engage in SDG&E's alleged tariff violations. Neither Aguilar nor Bryant mentioned disclosure of the alleged violations to a government agency.

In *Germany v. Ryder Dedicated Logistics* (N.D.Cal. Aug. 17, 1995, C 94-1969 TEH) 1995 U.S. Dist LEXIS 22384, at *1 (*Germany*), a district court considered a similar issue. In that case, the plaintiff, a truck driver, alleged his employer had an unwritten policy requiring him to drive routes that exceeded Department of Transportation regulations or risk termination. (*Id.* at *3.) The plaintiff had repeatedly complained about this policy to his supervisors. (*Ibid*.) The district court concluded that the plaintiff failed to produce evidence that his employer had a policy against disclosure of information to the government. (*Id.* at *14.) Instead, "the only policy plaintiff

10

identifie[d] is one of coercing employees into driving routes that take longer than 15 hours and omitting waiting time from their logs," which did not implicate section 1102.5(a).  (*Ibid*.)

Although district court cases are not binding on us, *Germany* is persuasive authority.  (*Hall v. Goodwill Industries of Southern California* (2011) 193 Cal.App.4th 718, 728, fn. 2, citing *Landmark Screens, LLC v. Morgan, Lewis & Bockius, LLP* (2010) 183 Cal.App.4th 238.)  The case before us is akin to *Germany* in that the only rule or policy that Bryant identified did not implicate section 1102.5(a) as Aguilar's statement did not target disclosure of information to a government agency.  Indeed, Bryant conceded at trial that SDG&E did not have any policies that prevented employees from being whistleblowers.

SDG&E also argues the evidence did not support the jury's verdict on Bryant's section 1102.5(a) claim because it did not show that Bryant attempted or intended to disclose information to a government agency and that any disclosure to a government agency caused Bryant's termination.  Based on our conclusion that no substantial evidence supported a finding that SDG&E had a rule or policy preventing an employee from disclosing information to a government agency, Bryant's section 1102.5(a) claim fails and we need not consider SDG&E's remaining sufficiency of the evidence arguments.

## II.  *PAGA Claim*

SDG&E argues the PAGA judgment should be reversed because it was based on the section 1102.5(a) violation, Bryant failed to exhaust his administrative remedies,

11

Bryant failed to prove any representative harm as required by PAGA, and the trial court failed to issue a statement of decision.

"In PAGA, the Legislature created an enforcement mechanism for aggrieved employees to file representative actions to recover penalties in cases in which there is no private cause of action as an alternative to enforcement by the Labor Commissioner." (*Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 650 (*Rope*).) "An employee plaintiff suing, as here, under the [PAGA], does so as the proxy or agent of the state's labor law enforcement agencies. The act's declared purpose is to supplement enforcement actions by public agencies, which lack adequate resources to bring all such actions themselves. [Citation.] In a lawsuit brought under the act, the employee plaintiff represents the same legal right and interest as state labor law enforcement agencies—namely, recovery of civil penalties that otherwise would have been assessed and collected by the Labor Workforce Development Agency." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 986.) " 'Recovery of civil penalties under [PAGA] requires proof of a Labor Code violation.' " (*Rope*, at p. 650.)

Here, Bryant pursued claims for violations of section 1102.5(a) and section 1102.5(c). The jury rejected Bryant's section 1102.5(c) claim but found SDG&E violated section 1102.5(a). The trial court assessed penalties under PAGA in the amount of $10,000. Thus, the PAGA penalties were necessarily based on SDG&E's violation of section 1102.5(a) as PAGA requires proof of a Labor Code violation. (*Rope*, *supra*, 220 Cal.App.4th at p. 650.) Because we concluded there was insufficient evidence to support the jury's finding that SDG&E made, adopted, or enforced a rule or policy to prevent

12

Bryant from disclosing information to a government agency (*ante*, pt. I), Bryant's PAGA claim also fails.

### III. *After-Acquired Evidence*

A. Additional Background

Bryant moved in limine to exclude evidence that "while he was employed by [SDG&E], [he] had parties attended by some SDG&E coworkers where there were female strippers, and that he had photographs of these strippers on his personal cellular phone." Bryant argued the trial court should exclude the evidence because it was irrelevant and its probative value was outweighed by the potential for undue prejudice.

SDG&E argued the evidence was relevant to its after-acquired evidence defense. Specifically, SDG&E alleged that if it had known of Bryant's misconduct at work and outside of work while Bryant was still employed at SDG&E, it would have terminated Bryant's employment. SDG&E clarified that the evidence it intended to introduce was that Bryant organized off-work events that included female strippers, invited employees he supervised to the parties and charged them entrance fees, took photographs of strippers on his cell phone, and showed the photographs to subordinate employees. SDG&E contended that Bryant's conduct was a conflict of interest in that he solicited money from subordinates for providing off-work adult entertainment. SDG&E also stated Bryant's conduct of showing photographs of strippers to other employees at work violated SDG&E's sexual harassment policy and potentially subjected it to claims of sexual harassment. SDG&E argued that it had a witness who would testify that Bryant's conduct constituted "severe unprofessional supervisory . . . behavior" that would likely have led to

13

his termination if SDG&E had known about it during Bryant's employment. SDG&E further stated its sexual harassment policy extended beyond the workplace and its witnesses would testify that SDG&E would have disciplined Bryant "including up to termination."

The trial court granted Bryant's motion without prejudice, concluding SDG&E failed to make a sufficient offer of proof that it had a "settled company policy" prohibiting Bryant's conduct. The trial court instructed SDG&E that if there was such a policy, SDG&E should bring it to the court's attention. Lastly, the court advised SDG&E to review relevant case law to determine the proper showing it had to make regarding a company policy prohibiting Bryant's conduct.

In discussing the jury instruction on the after-acquired evidence defense, SDG&E's counsel stated the decision on whether to include that instruction should be reserved pending additional research "[a]nd looking further into whether there's a policy that specifically addressed the behavior." The court reiterated that there had to be an offer of proof regarding SDG&E's actual policy before it allowed introduction of after-acquired evidence. SDG&E's counsel confirmed that it understood the court's request for an offer proof.

B. Analysis

SDG&E argues it should receive a new trial on Bryant's wrongful termination claim because the trial court improperly excluded its after-acquired evidence.

"The doctrine of after-acquired evidence refers to an employer's discovery, *after* an allegedly wrongful termination of employment or refusal to hire, of information that

14

would have justified a lawful termination or refusal to hire." (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 428.) "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone had the employer known of it at the time of the discharge." (*McKennon v. Nashville Banner Pub. Co.* (1995) 513 U.S. 352, 362-363.) Further, " 'the employer . . . must show that such a firing would have taken place as a matter of "settled" company policy.' " (*Murillo v. Rite Stuff Foods, Inc*. (1998) 65 Cal.App.4th 833, 846 (*Murillo*); see also CACI No. 2506.)

"Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion." (*Pannu v. Land Rover North America, Inc*. (2011) 191 Cal.App.4th 1298, 1317.) Further, when the trial court rules on a matter "without prejudice" and explains to counsel that it would reconsider the issue upon further briefing or a further showing, failure to renew the issue forfeits it on appeal. (See *People v. Mills* (2010) 48 Cal.4th 158, 170.)

Here, the trial court ruled on Bryant's motion to exclude the after-acquired evidence *without prejudice.* It suggested that SDG&E make an offer of proof as to whether the company had a settled policy that would have resulted in Bryant's termination based on the alleged improper conduct. Thus, the trial court invited SDG&E to raise the issue again. Based on our review of the record, SDG&E did not make an offer of proof as to its policy and failed to raise the issue again. Thus, it forfeited the issue on appeal.

Even if SDG&E did not forfeit the issue, we conclude the trial court acted within its discretion in excluding the after-acquired evidence. SDG&E did not identify a "settled company policy" that would have resulted in Bryant's termination. Instead, during the hearing on Bryant's in limine motion to exclude after-acquired evidence, SDG&E vaguely stated Bryant's conduct constituted "severe unprofessional supervisory . . . behavior" and violated SDG&E's sexual harassment policy. SDG&E did not provide that policy or specify its terms to the court despite the court's request.

SDG&E's Code of Business Conduct included a section entitled, "Discrimination and harassment-free workplace." The Code of Business Conduct was presented as evidence during trial, but not in connection with SDG&E's after-acquired evidence defense. Instead, SDG&E merely questioned Bryant as to whether he had knowledge of the Code of Business Conduct, including the section pertaining to harassment, and whether he followed it. The discrimination and harassment section provided: "[r]emarks, jokes or pictures that are offensive or discriminatory in any way aren't allowed in the workplace. [¶] A supervisor who becomes aware of possible discrimination or harassment must report the situation to the proper company contact at once. Any supervisor who fails to do so is subject to disciplinary action, up to and including termination of employment." A question and answer portion of the document stated: "Sexually suggestive images are unacceptable in the workplace and should be removed at once." SDG&E failed to inform the court that it was seeking to use its Code of Business Conduct to support its after-acquired evidence defense. Based on the showing that SDG&E made in connection with its after-acquired evidence defense, the trial court acted

16

well within its discretion in excluding the evidence, especially where, as here, the court provided SDG&E an opportunity to cure its deficient showing.

IV. *Alleged Instructional Errors*

SDG&E argues it should receive a new trial due to multiple instructional errors. Specifically, SDG&E contends the "cat's paw" jury instruction on Bryant's wrongful termination claim was not properly stated in the conjunctive and did not require the jury to find a specific intent. SDG&E also argues the section 1102.5 cat's paw instruction shared the same flaws as the wrongful termination cat's paw instruction, was unclear as to whether it applied to Bryant's section 1102.5(a) or section 1102.5(c) claim, and reduced the causation standard of proof from "substantial motivating reason" to "contributing factor." Based on our conclusion that there was insufficient evidence to support the jury's finding on Bryant's section 1102.5(a) claim and the jury's rejection of Bryant's section 1102.5(c) claim, we need not consider SDG&E's section 1102.5 alleged instructional errors. On the wrongful termination cat's paw instruction, we reject SDG&E's arguments.

"We independently review claims of instructional error viewing the evidence in the light most favorable to the appellant." (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.) " 'The refusal of a proper instruction is prejudicial error only if " 'it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" [Citation.] "[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." ' " (*Ibid.*)

17

The cat's paw doctrine pertains to the element of causation. Under this theory, employers may be held "responsible where discriminatory or retaliatory actions by supervisory personnel bring about adverse employment actions through the instrumentality or conduit of other corporate actors who may be entirely innocent of discriminatory or retaliatory animus." (*Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 116 (*Reeves*).) "Of course, proof of discriminatory animus does not end the analysis of a discrimination claim. There must also be evidence of a causal relationship between the animus and the adverse employment action." (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 550.) The cat's paw doctrine rejects the notion that an employer satisfies its duty of negating the causation element by showing that the specific corporate actor who took the adverse employment action has no discriminatory or retaliatory animus. (*Id.* at p. 551.) "[S]howing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." (*Ibid.*)

Here, on Bryant's wrongful termination claim, the trial court instructed the jury with a modified version of CACI No. 2511 on the cat's paw theory:

> "In this case, the recommendation to discharge David Bryant was made by Tina Chen-Peters and Nicole Galicia of SDG&E's Diversity Department. SDG&E claims that the decision to discharge David Bryant was based on this recommendation and was made by SDG&E's Director of Labor Relations and Human Resources, James Boland, and its Director of Field Services, Jorge DaSilva. Even if Tina Chen-Peters, Nicole Galicia, James Boland and Jorge DaSilva did not hold any retaliatory intent or were unaware of David Bryant's

18

conduct on which his claim of retaliation is based, SDG&E may still be liable for retaliation if David Bryant proves both of the following:

"1.     That David Bryant's protected activity was a substantial motivating reason for his supervisor, Phillip Heiner:

> "a.     Expanding Diversity's investigation of David Bryant by reporting other alleged misconduct by David Bryant to Tina Chen-Peters and Nicole Galicia;

> "b.     Providing misleading information to Tina Chen-Peters and Nicole Galicia;

> "c.     Agreeing with the recommendation to discharge David Bryant and telling Jorge DaSilva he agreed with such recommendation; and

"2.     That Phillip Heiner's acts were a substantial motivating reason for Tina Chen-Peters' and Nicole Galicia's recommendation to discharge David Bryant, or to James Boland's and Jorge DaSilva's decision to discharge David Bryant based on that recommendation."

We reject SDG&E's argument that the cat's paw instruction was not properly stated in the conjunctive and "the jury was free to find causation based solely on the last element—Heiner's agreement with DaSilva's decision."  First, reading the instruction as a whole, it was stated in the conjunctive.  It required the jury to find *both* that: (1) Bryant's protected activity was a substantial motivating reason for Heiner doing three specified acts, and (2) Heiner's acts were a substantial motivating reason for Chen-Peters and Galicia's recommendation to discharge Bryant, or Boland's and DaSilva's decision to discharge Bryant.  Subpart (1) specified three distinct acts by Heiner, including expanding the diversity department's investigation, providing misleading information, and agreeing with the recommendation to discharge Bryant.  Subpart (2) required the jury

19

to find Heiner's "acts," were a substantial motivating reason for the recommendation or decision to discharge Bryant. Because subpart (2) utilized the term "Heiner's acts" (stated in the plural) and that reference was naturally to the three acts specified in subpart (1), we reject the notion that the jury could have found causation based solely on Heiner's agreement with the recommendation to discharge Bryant.

Based on our review of counsel's arguments, the parties did not suggest to the jury that they could find causation based solely on one of Heiner's acts identified in subpart (1) of the cat's paw instruction. Additionally, there was no indication that the jury was misled in this regard. Bryant's counsel detailed in closing argument how Heiner committed the acts identified in each subpart. There was nothing in counsel's argument from which the jury could infer that only one of the subparts was required to prove wrongful discharge. Lastly, we note that SDG&E failed to include a complete set of jury instructions in the record on appeal. Accordingly, we are unable to evaluate the impact of other jury instructions in determining prejudice.

SDG&E also contends the cat's paw instruction on Bryant's wrongful termination claim was flawed because it failed to require that Heiner had a specific intent to cause Bryant's termination. The cat's paw instruction provided to the jury in this case was modeled after CACI No. 2511, which does not include the specific intent language that SDG&E claims is required in the instruction. The instruction properly required the jury to find that Bryant's protected activity was a substantial motivating reason for Heiner committing specified acts and that those acts were a substantial motivating reason for Bryant's discharge from employment. (See CACI No. 2511.) Further, based on the

20

complete instruction and counsel's arguments, they conveyed to the jury that under the cat's paw theory, it was required that Heiner "acted out of discriminatory or retaliatory animus, and [his] actions were a but-for cause of the challenged employment action." (*Reeves*, *supra*, 121 Cal.App.4th at p. 113.)

Based on the foregoing, we reject SDG&E's claims of instructional error.

## V. *Punitive Damages*

SDG&E argues the jury's punitive damages award should be reversed because there was insufficient evidence that a managing agent acted with malice. Alternatively, SDG&E contends the punitive damages should be reduced because the amount awarded was unconstitutionally excessive. We agree that there was insufficient evidence that a managing agent acted with malice and, therefore, reverse the punitive damages award. Based on our conclusion, we need not address whether the amount awarded was unconstitutionally excessive.

Punitive damages generally may be awarded to a plaintiff in a civil action only if "the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) "Malice" is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others;" "oppression" is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights;" and "fraud" means "intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the

21

part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."  (Civ. Code, § 3294, subd. (c).)

Corporations may be held liable for punitive damages if there is "evidence that the employer authorized or ratified a malicious act, personally committed such an act, or wrongfully hired or retained an unfit employee.  For corporate or other large organizations, such conduct must have been performed by an ' "agent . . . employed *in a managerial capacity* and . . . *acting in the scope of employment*," ' or ratified or approved by a ' "managerial agent" ' of the organization."  (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 723 (*College Hospital*).)  In that regard, Civil Code section 3294, subdivision (b), provides:

> "An employer shall not be liable for [punitive] damages . . . based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. *With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation*."  (Italics added.)

"Managing agents" are employees who "exercise[] substantial discretionary authority over decisions that ultimately determine corporate policy."  (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 573 (*White*).)  "[T]o demonstrate that an employee is a true managing agent under [Civil Code] section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial

discretionary authority over significant aspects of a corporation's business."  (*White*, at p. 577.)

Corporate ratification "generally occurs where, under the particular circumstances, the employer demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious behavior by an employee in the performance of his job duties."  (*College Hospital Inc.*, *supra*, 8 Cal.4th at p. 726.)  Ratification amounts to essentially the "confirmation and acceptance of [such] previous act."  (*Cruz v. Homebase* (2000) 83 Cal.App.4th 160, 168 (*Cruz*).)  However, "[a] corporation cannot confirm and accept that which it does not actually know about."  (*Ibid.*)  Rather, there must be evidence that officers, directors, or managing agents had actual knowledge of the malicious conduct and its outrageous character.  (See *College Hospital*, *supra*, 8 Cal.4th at p. 726.)

Here, SDG&E asserts there is no substantial evidence to support a finding that a managing agent of SDG&E acted with malice.  Preliminarily, we note that malice is not the only conduct that could have supported the jury's punitive damages award.  Rather, in a special verdict form, the jury concluded SDG&E engaged in conduct constituting "malice, oppression or fraud."  Additionally, the jury's punitive damages award was not necessarily limited to a finding that managing agents themselves acted with malice.  In addition to finding that one or more officers or managing agents *committed* conduct constituting fraud, oppression or malice, the jury concluded officers, directors or managing agents *authorized*, *adopted*, or *approved* of the malicious, fraudulent or oppressive conduct.

23

Because the jury's verdict does not specify exactly what conduct by SDG&E was malicious, oppressive, and fraudulent, we review the evidence to determine whether there is substantial evidence of *any* conduct committed or ratified by SDG&E that could be found, by clear and convincing evidence, to have been malicious, oppressive, or fraudulent. (*Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115, 1139.)

Malice, oppression, and fraud may be inferred from the circumstances of a defendant's conduct. (*Monge v. Superior Court* (1986) 176 Cal.App.3d 503, 511.) Bryant's primary argument at trial was that the diversity department's investigation of him was conducted for the purpose of looking for a way to fire him. Bryant presented evidence that although the investigation started based on an allegation of sexual harassment, the diversity department expanded the investigation as a result of information from Heiner that was not related to the sexual harassment charge. Thereafter, the diversity department interviewed 40 people and concluded that Bryant engaged in improper behavior. Some of the diversity department's findings were questionable. For example, the diversity department concluded Bryant targeted certain employees by conducting an excessive number of field observations on those employees. Although there were documents on Bryant's actual field observations, the diversity department did not review those documents before making its conclusions and instead relied on "perceptions" of employees. Additionally, the diversity department's report partially relied on a 2008 interim disciplinary report that was supposed to be removed from Bryant's personnel file. Further, a member of the diversity department testified that Bryant's personnel file included a "pattern of yelling." However, other than one incident

described in the 2008 interim disciplinary report, the diversity department could not identify any other instances of Bryant yelling and conceded that one incident does not constitute a pattern. The diversity department did not give DaSilva or Boland, the ultimate decision makers, a copy of its report to keep.

Bryant also presented evidence that he repeatedly complained about SDG&E's tariff violations. At one point, Bryant was hushed or silenced when he complained. At another point, Aguilar told Bryant he was difficult to deal with and threatened to fire Bryant if Bryant did not stop complaining about SDG&E's tariff violations.

Assuming, without deciding, that these instances amounted to malicious or oppressive conduct by SDG&E employees, we conclude there was insufficient evidence that a managing agent committed or ratified the conduct. At trial, Bryant only identified Boland as a managing agent. On appeal, however, Bryant asserts Aguilar, Heiner, and DaSilva could also be considered managing agents for purposes of the punitive damages award. We do not consider whether Aguilar, Heiner, and DaSilva were managing agents as they were not presented as such to the jury. (*Martinez v. Scott Speciality Gases, Inc.* (2000) 83 Cal.App.4th 1236, 1249 [" 'An argument or theory will generally not be considered if it is raised for the first time on appeal.' "].)

Boland was clearly a managing agent. He was the Director of Labor Relations and Human Resources. He managed essential parts of SDG&E and dealt with issues potentially involving every employee of the company. Boland did not report to anyone on matters of labor relations and gave the final word on behalf of the company.

25

Accordingly, we review the record for substantial evidence to support a finding that Boland committed or ratified malicious or oppressive conduct.

Bryant contends Boland committed or ratified malicious or oppressive conduct because, despite Bryant's 23-year history with SDG&E, Boland did not sufficiently read the diversity department's report before terminating Bryant's employment. However, there was no evidence that Boland had actual knowledge that SDG&E employees engaged in malicious or oppressive conduct. Specifically, there is nothing in the record to suggest that Boland knew the diversity department's investigation was flawed or improperly expanded. Further, there was no evidence that Boland had actual knowledge that Bryant had complained about tariff violations. The parties have not pointed to and we have not found anything in the record suggesting that Boland had actual knowledge of any malicious or oppressive conduct and its outrageous character. (See *College Hospital*, *supra*, 8 Cal.4th at p. 726.) The manner in which Boland handled Bryant's termination, including merely skimming the diversity department's report and being unable to identify the misconduct leading to Bryant's termination, was negligent at best.

Based on the foregoing, we conclude there was insufficient evidence to support the jury's punitive damages award.

DISPOSITION

The judgment on Bryant's section 1102.5(a) and PAGA claims is reversed. Accordingly, the $10,000 in penalties assessed for the PAGA violation are reversed. We also reverse the punitive damages award of $1,300,000. In all other respects, the judgment is affirmed. Each party shall bear their own costs on appeal.


McINTYRE, Acting P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.

27